## JOHN T. PARKER V. THE STATE.

*No. 315. Decided March 4.*
*Motion for Rehearing Decided March 24.*

33  111
s35   13

1. **Murder—Self-Defense—Charge—Practice.**—On a trial for murder, where the charge on self-defense practically states the law, and is not excepted to, it will be no ground for reversal that it is subject to criticism, if upon the whole case it appears that defendant could not have been injured by the defects complained of.

2. **Same—Special Venire—Diligence in Serving the Writ.**—On a trial for murder, where a motion was made to quash the special venire because the sheriff's return failed to show the diligence used as to summoning the unserved jurors, where the return did show that some of the parties (naming them), after proper search and inquiry at their places of residence, were found not to be in the county, and the others (naming them) resided in such remote parts of the county as rendered it impossible, by diligent effort, that they could be reached within the time allowed for making the service and return, *Held*, the diligence was sufficient.

3. **Same—Practice.**—On a motion to quash a special venire because proper diligence is not shown by the return as to the unsummoned jurors, it should further be shown that the jurors summoned were not sufficient to enable the defendant to obtain a fair and impartial trial.

4. **Witness of Tender Years—Competency—Judicial Discretion—Practice on Appeal.**—The method of testing the competency of a witness of tender years is confined to the discretion of the trial judge, and his action in determining the question will not, ordinarily, be disturbed in the absence of any showing of the abuse of such discretion.

ON MOTION FOR REHEARING.

5. **Trial—Severance of Codefendants—Practice.**—Where two or more joint defendants each make proper application for severance, asking that the codefendant be first tried, and they fail to agree upon the order of trial, it is not error for the court to direct which one shall be first tried.

6. **Motion for New Trial—Argument of Counsel—Applause of Audience.** A motion for new trial will not be granted because the audience applauded the address of the State's counsel, where it appears that the court promptly suppressed the demonstrations and reprimanded the parties engaged in it, and especially so when there had been no previous motion for change of venue, and there is no complaint that a fair trial could not be had in the county.

7. **Witnesses—Practice on Appeal.**—The court, on appeal, can not pass upon the credibility of witnesses.

**8. Verdict—Matters Not Supported by the Record—Practice on Appeal.**
On appeal the court will not consider ex parte affidavits to the effect that the verdict was returned after the term of court had expired, when the record contains no such matter.

APPEAL from the District Court of Nueces. Tried below before Hon. J. C. RUSSELL.

Appellant and one Yndalacio Rosales were jointly indicted for the murder of Elias Mussett. Defendant filed a motion, in conformity with the provisions of article 669a of the Code of Criminal Procedure, for severance, in order that said Rosales might first be tried. Rosales had on the day before filed a similar motion in his case with regard to a severance from defendant, and, though it does not clearly appear, we infer from the record that he objected to the granting of appellant's motion. At all events, the parties could not agree in the matter, and the court ordered this defendant first placed on trial, which trial resulted in his conviction for murder in the first degree, with punishment assessed at imprisonment for life in the penitentiary.

The entire testimony adduced on the trial is as follows:

Francisco Grande, Jr., being duly sworn, says: "My name is Francisco Grande, Jr. I live on the Hill in Corpus Christi. I know the defendant John T. Parker. I saw him on the Hill on the morning of the 6th day of May, 1892, at or near Yndalacio Rosales' saloon, at about twenty minutes past 1 o'clock that morning. A little before that hour E. T. Mussett, the deceased, called at my saloon and asked for a drink of water and bought a cigar. He remarked that it was late, lit the cigar, and got on his horse and rode in the direction of his home; passed Yndalacio Rosales' saloon. Yndalacio said, 'Blas.' E. T. Mussett turned his horse's head and came toward where Yndalacio was standing, and stood talking with Yndalacio five or six minutes. The defendant John Parker rode up to where Mussett was, and Parker and Mussett had some conversation, but I did not know what was said. In about a half-minute or so I heard the report of a pistol shot. I was standing in my saloon door (north door) looking west, in the direction of Yndalacio's saloon. On hearing the shot I immediately closed the door of my saloon and went over to where Yndalacio Rosales was standing. Next after me came Alejando Rodriques, and then came Mària Vela. As I approached the place of the shooting I saw defendant standing near the body of Mr. Mussett, in a stooping position, as though he was examining it. He was on foot. Defendant's horse and Mussett's horse were standing close to the horse rack, the two horses forming an angle with heads of both horses towards the horse rack. Mussett was lying on the ground, face up, with his head towards the sidewalk and feet to the street, his right hand extended, and about eight or ten inches from his right hand was Mussett's pistol lying on the ground. I asked Yndalacio why Parker shot Mussett.

He said for something that was worthless. When defendant rode up to where Mussett and Yndalacio Rosales were, Mussett was sitting on his horse sideways, with his left foot out of the stirrup and resting his right arm on the horn of the saddle, with the bridle reins of the horse in his right hand and nothing in his left hand. Do not know whether he lit his cigar before he left my saloon or afterwards. I did not notice what Parker said to Rosales, except that he was going for the doctor. He (Parker) talked to Yndalacio in Spanish. Just as quick as I could close one shutter of my saloon I started over to where the shooting was, which was about in a minute and a half. When I started to go there, Alejando came along after me; then came Maria Vela. Parker said, as he rode off down the street, that he was going for the doctor and to surrender. I could see where Mr. Mussett stood, because of the reflection of the electric light from Yndalacio's saloon, and also from the reflection of the street corner light opposite my north door. The moon was shining also."

Cross-examined by counsel for defendant: [Witness was here shown a map or plat of locality of the homicide, and marked on the diagram relative position of defendant, deceased, and Yndalacio Rosales, horse rack, saloon corner of Rosales, the streets, and saloon of witness, opposite corner.] And in answer to cross-interrogatories, witness answered as follows: "The reflection from the street corner light north of me, in front of the little Mexican restaurant, strikes the ground at my saloon north door, and also reflects to where Mussett stood. My west door, facing toward Rosales' saloon, on that night was closed, it being windy, and I was standing in my north door looking in the direction of Y. Rosales' saloon. The door shutters of my saloon swing outside, and are about three or four feet from the west corner of my saloon. My sidewalk is about ten or twelve feet wide; don't know exactly the width of the street between my saloon and Y. Rosales'. The width of the street I do not know—sixty feet more or less from the corner of Rosales' saloon to the west end of the horse rack, where Elias Mussett sat on his horse when shot. I can not tell the distance. Elias Mussett was beyond the west end of Rosales' saloon. I could not say whether it was 60 feet or 90 feet or 120 feet from where I was standing in the door of my saloon to where Mussett's horse stood when he was shot. I don't know how long Rosales' saloon is from east to west. Am familiar with the inside of that saloon; it was once kept for a dance hall; do not know its length from east to west. When Y. Rosales called 'Blas,' Mr. Mussett turned and came down to where he was standing, when Parker rode up. Parker spoke the first word. I do not know what he said, and I do not know what Elias said prior to the shooting. Within half a minute or so the pistol fired. Parker fired the pistol. I immediately closed my door shutter and ran over to where the shooting was, and Yndalacio said that John had killed Mussett for a thing

worth nothing—for something hardly worth noticing. As soon as John fired he dismounted and went up to where the body of Mussett was. Mr. Parker stooped down to look at the body, and then told Yndalacio Rosales that he (Yndalacio) well understood how it had happened, and further remarked that he would go for the doctor and then go to the court house and surrender. It was not cloudy; the moon was shining. The windows in Rosales' saloon have board slats nailed over them on the outside. If there had been no electric light I could have seen the parties from where I stood by the light of the moon. I did not speak to my partner before I arrived at the place of the shooting. Alejando came on behind me, but I did not speak to him nor to Parker. I did not say to any one that I believed Mussett had shot himself before going over there. I came back to my saloon, closed the back doors, then called my brother Ben. The social relations between Y. Rosales and myself are such that we only salute each other when we meet; that was our feeling before and after the homicide. [Here he is shown the diagram, and locates Parker between Mussett and himself, standing in the door of his saloon.] Parker did not touch the body of Elias Mussett."

John W. Mussett, being duly sworn, says: "My name is John W. Mussett. Elias T. Mussett is dead; he died from a pistol-shot wound in the left side, about here (pointing to a spot on his own person above the left nipple.) [Here the clothes of deceased were shown him, and witness answers]: I recognize these as the clothes Elias had on, both coat and vest. The ball from the pistol took a course from the place of entrance downward and towards the right side of deceased. I saw the doctor, A. E. Spohn, probe the wound with a pencil, and that is the course the ball took, passing through the heart. E. T. Mussett was city marshal of the city of Corpus Christi. The ball did not come out of the body. The coat and vest match and of same suit."

Here the coat and vest of deceased were submitted to the jury for their inspection.

Here the State rested.

John T. Parker, the defendant, being duly sworn, in his own behalf testified as follows: "On the night of the 5th of May and on the morning of the 6th of May, 1892, I was on police duty on the Hill. I am a policeman of the city of Corpus Christi. While on duty I was at the club room on the Hill where they were celebrating the 'Cinco de Mayo.' I was sitting on my horse when Marshal Mussett rode up. I said, 'How is tricks?' Elias replied, 'I have got a hell of a gang on now [referring to the new policemen]; that crowd pushed you out of the saloon last night and shit on you.' I replied, 'You are not mad, are you? Investigate the thing first.' Elias then answered, 'Well, I am going to investigate it; you remain here and I will take a turn down town.' About twenty minutes to 1 o'clock on the morning of

the 6th I next saw him; we spoke together at Achalino Rosales' corner. Placido Lopez, who was present, said, 'I like you first rate, and I like you first rate,' referring to both Elias and I. Then Elias Mussett said * * * [Language too obscene to be reproduced, and not deemed essential.—Reporter]. I turned my horse east and said, 'I am going to call at the Mexican bakery.' I did not see which way he went off. I left him standing there when I rode off; I intended to take a 'round' and come back to the 'May feast' at the club room. I got as far on my way back as Yndalacio Rosales' saloon; I rode up and Elias Mussett and Yndalacio were standing there near the west end of the horse rack talking, Rosales afoot, Marshal Mussett mounted. I said to Rosales, 'What is the news?' Rosales replied, 'Nothing, nothing; dull, dull.' I said to Marshal Mussett, 'How is tricks?' Mussett replied, 'Oh, all right.' Mussett then said, 'Nobody but a son-of-a-bitch would stand to be pushed out of a saloon by that crowd like you were last night.' I then said to him, 'Whoever informed you of that told you a damned lie.' Mussett then said, 'It is a fact, and there is no use of you denying it, you lying son-of-a-bitch.' I then said, 'Go slow on this thing; what is the matter, Elias?' Then Mussett said, 'Slow, hell, you know it is true; what is the use of lying about it?' I then said, 'It is a damned lie.' He then said, 'You can't tell me that, you lying son-of-a-bitch,' and reached for his pistol. [Here the defendant made a forward movement of his body and motion of the hand to illustrate.] Then I went for mine about the same time, and about the time he had his pistol out and in position to drop on me I had my pistol fired. I had one of those short pistols, and Elias had a long one, was why I got there first. When I fired my pistol, Elias fell on the off-side of his horse to the ground; I thought I had only wounded him in the arm, and that I could get his pistol from him without having to kill him. I dismounted and approached within three or four feet of the body; I saw that Elias' pistol was on the ground by his right hand. I turned to Yndalacio and said, 'I think I have killed him; I am going down to surrender to the sheriff; I only want of you a true statement of this affair.' Yndalacio Rosales then said, 'That is the best thing that you can do.' The foregoing conversation was in Spanish, but I have given you the English of it. I speak fluently the Spanish language. I came on down to the county jail of Nueces County and surrendered myself to the deputy sheriff, Lee Riggs. On my way to surrender I met with Policeman Henry Busch, at the Artesian square, to whom I related what I had done."

Cross-examined by the State: "I first met the deceased at the club room on the Hill, next to Achalino Rosales' corner saloon. From there I went around to a bakery. The next time I saw him was at Yndalacio Rosales', at the place of the shooting. Elias' horse was a little lower·

in height than my horse, and when I shot, his horse was standing in a ditch on same street."

Lee Riggs, witness for the defendant, being duly sworn, says: "The defendant John T. Parker came to the county jail about half-past 1 o'clock on the morning of the 6th of May, 1892, and surrendered himself a prisoner. After the sheriff came to the office, I went on the Hill and found E. T. Mussett dead on the ground and pistol lying near his right hand, with his hands outstretched—eight or ten inches, or maybe a foot, between the pistol and his hand. The pistol near his hand was a Colt's forty-five, wood handle."

Question: "Explain the difference between the pistol that Parker used on that night and the one found by Mussett's hand."

Answer: "Mussett's pistol was a wooden-handle, forty-five Colt's, long barrel, and Parker's was a short pistol, forty-five, and here it is." [Witness exhibits Parker's pistol.]

P. R. Mitchell, witness for the defendant, being duly sworn, says: "I live in Corpus Christi. Know defendant. Knew deceased. I was there at the club room on the night of 5th of May, 1892. I heard a part of a conversation between defendant and deceased that night. I heard Mr. Parker tell Mr. Mussett that whoever told him (Elias) that told a lie. I did not know to what he referred. I saw them no more that night. There were several ladies with me to see the May feast decorations of the club room. From there we went home."

Cecilio Bustamente, a witness for the State in rebuttal, was sworn, and in his voir dire, over the objection of defendant, answers substantially as follows: "My name is Cecilio Bustamente. I came from Brownsville about two years ago. I am twelve years old. My father is a carpenter. I have been here in Corpus Christi about two years. I live at the house of Santos Lores. I can not read or write. I have never attended school. I have been to the Catholic church. I do not know the name of either of the Catholic priests in Brownsville. I do not know what will be done with me if I tell a lie. I reckon I will be punished, but do not know how punished. It would be wrong to tell what is false. [Here the court ruled the witness competent, to which ruling defendant excepted, and said witness says as follows:] I live on the Hill, near Mr. A. Rosales' saloon. Blas Mussett was killed on the night of 5th of May. Don't know who killed him. I was at the Cinco de Mayo dance that night. I was playing with other Mexican boys. I do not know who they were; don't know their names. About half-past 1 o'clock I heard a pistol shot. I ran to Yndalacio's saloon and I saw the body of Blas Mussett. I saw Yndalacio come out of his saloon and stoop down and pull a pistol out of the scabbard and put it close to the hand of Blas, and then Yndalacio said: 'Yes, that is Blas Mussett.' Blas Mussett was then snoring. He was not dead, only snoring. When I first saw Yndalacio he was coming out

of his bar room. There was no one on the sidewalk. I saw no one else there but Yndalacio. When I heard the shot fired I was at the Mexican club room, two and a half squares distant from where the shooting was. There are a great many houses between Yndalacio's bar room and the club room, and it is across squares on another street and across the railroad track. I saw no one there but Yndalacio Rosales. No one on the street. Did not see Francisco Grande there. He was not there. John Parker was not there."

Here the defendant was pointed out to witness and asked: "Did you see that man there that night when Blas was killed?"

Witness answered: "I did not. I saw Yndalacio take Blas' pistol from the end of the scabbard and place it near the tip of Blas' fingers, and said, 'Yes, that is Blas Mussett.' When I heard the shot I ran to Yndalacio's saloon."

Cross-examined by the defense: "I heard the shot and knew it was at Yndalacio's saloon. I crossed the railroad track and went down to where Blas was, on the side of the street by Mr. Blain's. I staid there where Blas was a little while; no one came; then I went home, and after that I came back; as I passed Mr. Vela's saloon on my way home I told him (Vela) that Blas Mussett was killed. I never talked about this case to any one except the women where I stop. I was at the Market Hall before the committee to tell them what I knew, and that is the only place where I told anybody. It was dark that night when I saw Blas lying on the ground—no light except the light from Yndalacio's bar room, which was open. The pistol was in the scabbard about an inch when Yndalacio pulled it out and said, 'Yes, this is Blas Mussett.'"

Mr. Vela, a witness for the defense, being duly sworn, says: "I know Cecilio Bustamente, the boy witness; he lives with Santos Lores in a house just back of my and A. Rosales' saloon; I saw him pass by my sidewalk about not less than ten, but think fifteen, minutes after the shooting of Mussett; as the boy Cecilio passed by he stuck his head into the window and said, 'Blas Mussett killed himself.' The words used by the boy were in Spanish, and are these, 'Blas Mussett se a matado,' which I understood to be that 'Blas Mussett killed himself.' About half-past 12 o'clock of that night deceased and defendant were in conversation in front of my saloon with other parties; they were talking loud, but I was at work on the inside and did not hear what was said by either."

The matters presented by bills of exception, and discussed in the opinion of the court, will be found fully stated below in the brief of appellant's counsel.

*Marshall Rogers* and *Walton, Hill & Walton,* for appellant.—1. The testimony of the State makes out a case of murder in the second de-

gree; that of the defendant makes out a complete case of self-defense. The case of the State is murder in the second degree, because, and only because, the killing is not explained. The testimony of the defense furnishes the explanation, and all the testimony taken together erects a case of not only full but unequivocal self-defense. Penal Code, art. 606; Willson's Crim. Laws, secs 1036–1041, 1043.

2. The foregoing being the facts, the court of its motion, among other things, charged the jury as follows:

"Upon the question of self-defense you are instructed, that defendant would be justified in killing the deceased if it is shown to have been done to prevent the deceased from *murdering* or *maiming* him; but in that case it must reasonably appear, by the acts or by words coupled with the acts of deceased, that he *intended* to *murder* or *maim* the defendant, and the killing must have taken place while the deceased was in the act of committing such offense after such act done by him, showing *evidently an intention* to commit *such offense.* If, therefore, you believe from the evidence that at the time of the homicide the deceased and defendant were having an angry altercation, and deceased told defendant that he could 'not call me a liar, you damned lying son-of-a bitch,' and at the same time reached for his pistol and *drew it,* and that defendant *did believe* that the deceased was about *to maim* or *murder* him, and that while deceased was in the act of making *such hostile demonstrations* defendant shot and killed him, then the defendant was justifiable in killing the deceased, and if you so find, you will acquit him." (The italics are ours.)

This charge was not excepted to, but it is so palpably erroneous and the injury to defendant so self-evident, that the law utterly condemns it, and this court will affirm the condemnation. Will it bear dissection? Let us see:

(1) The law is, that the unlawful attack will justify homicide if it is such as produces a reasonable expectation or fear of death or some serious bodily injury. Penal Code, art. 574, sec. 967. Contrast this code law with the words of the charge as quoted above.

The grounds of justifiable homicide are dismembered, restricted, and limited. The "serious bodily injury" is left out, while the attack is intensified from "reasonable expectation" to "showing evidently an intention" to commit the act that would justify the homicide. An omission on the one side that was fatal to according defendant his lawful right, and on the other intensifying the appearance by making it evident, instead "of reasonably to appear."

(2) It intensifies "reasonable expectation" to "did believe," and restricts the hostile act to an evident intention to maim or murder, instead of leaving it with the law as it is written, "a reasonable expectation or fear of death or some serious bodily injury."

(3) It restricts the right of defendant to act, to an evident intention to maim or murder on the part of the deceased; not only so, but defendant is yet further restricted, not only to deceased reaching for his pistol to execute his evident intention that defendant believed he was about to execute, but he must wait until deceased had drawn his pistol.

(4) Not only all this, still defendant was not authorized to defend his life in this crisis of danger unless deceased had previously said to defendant "that he ·(defendant) could not call me (deceased) a liar, you (defendant) damned son-of-a-bitch."

The law of self-defense includes resistance even to the death of the assailant to prevent bodily injury. Willson's Crim. Law, sec. 970. Article 570, Id., comprises all cases in which, from the acts of the assailant or his words coupled therewith, it reasonably appears that his purpose or intent is to murder, * * * maim, * * * or to do other serious bodily injury to the assailed party." Hunnicut's case, 20 Texas Crim. App., 643–645.

That this is the law is fixed and settled in the jurisprudence of Texas, and can not now be disturbed without revolutionizing our judicial decisions. Stare decisis is a rule recognized throughout the civilized world. It is infinitely preferable to adhere even to a wrong decision than to have the law of the State that concerns life and liberty undulating like a cork on restless waves, or shifting as sands that take other position with every passing wind. Authorities cited in Hunnicut's case, supra.

It was the duty of the court to give the law of the case (Willson's Crim. Law, sec. 2332; Code Crim. Proc., art. 677), and in felony must give all the law of the case. Willson's Crim. Law, sec. 2338. Error in charge, if fundamental, will work reversal, notwithstanding no exception be reserved thereto. Lloyd's case, 19 Texas Crim. App., 323, and authorities cited; Hayne's case, 2 Texas Crim. App., 84; Marks' case, 10 Texas Crim. App., 335; Bailey's case, 26 Texas Crim. App., 706; Willson's Crim. Law, sec. 2363.

3. The indictment is joint against the defendant and one Yndalacio Rosales for murder.

On the 12th of the month Rosales made the statutory affidavit for severance, on the ground that in his belief there was no evidence against his codefendant, and that he needed his testimony in his (affiant's) defense. On the 13th defendant made a like affidavit, seeking his codefendant as a defensive witness. The parties could not or did not agree which should be first tried. The matter was remitted to the court for a ruling. The court ordered the defendant to trial over the objections of defendant.

The affidavit of the codefendant Rosales was made known to the court by the first witness examined to be positively false, and the same testimony was very suggestive that the movement of Rosales was

one adverse to defendant. In the language of this court, "the right to sever and place his codefendant on trial, and to use him as a witness if acquitted, is a right guaranteed to every one accused of crime." Conn's case, 11 Texas Crim. App., 391.

There was no evidence against the codefendant. He was a material witness for defendant. Defendant was denied the testimony. He was denied a right given to him by the law. The State had the right to controvert the truth of the affidavit of defendant, wherein it is stated there was no evidence against the codefendant. Reed's case, 11 Texas Crim. App., 515.

No proposition to controvert was made, and no controverting affidavits tendered. This is a valuable right, and the court will protect it in all proper cases where it has been denied. Forcey's case, 29 Texas Crim. App., 408; Tieman's case, 28 Texas Crim. App., 144.

4. The defendant moved to quash the special venire, because the return of the sheriff thereon failed to state the diligence that had been used to summon the jurors, and the cause of the failure to summon them. Code Crim. Proc., art. 614. The court overruled the motion. The action of the court was duly reserved by bill.

The venire was for 120 men, of whom 93 were summoned. The return of the sheriff on the point made was as follows: "The following named persons were not summoned as special jurors in this case, for the reason that said persons reside or are in such remote parts of the county, and after diligent efforts could not be reached within the time allowed the sheriff for making service and return of this writ." Both preceding and following this recitation by the sheriff is given a list of the jurors "not found, for want of time."

The whole spirit of the law is frustrated if compliance with it is ordered and executed in the manner shown here. Murray's case, 21 Texas Crim. App., 474.

5. The third bill of exception reserves the point as to qualification of witness Cecilio Bustamente, because of lack of moral culture to entitle him to be sworn and examined in the case as a witness for the State.

The court ruled that the witness was mentally capacitated, and had sufficient moral training to be used as a witness.

There were no instructions given to this boy, no moral lessons imparted by the court or by a committee. Holst's case, 23 Texas Crim. App., 1; Taylor's case, 22 Texas Crim. App., 531.

6. A fourth bill of exceptions was reserved to a proceeding that was disgraceful to civilization—in full keeping, however, with excited human passion and thirst for human life. The scene was this, as painted in the transcript:

The evidence was closed, and the closing argument being made for the State. Counsel referred in impassioned eloquence to the pity that

the jury owed to the deceased's family, instead of the defendant, and urged on the jury to bring in a verdict in support of the indictment. After this argument, and before the charge of the court was given, the thronged audience applauded said argument by the clapping of their hands and the stamping of their feet in the presence and hearing of the jury, court, and bar, and defendant was powerless to prevent it. This demonstration on the part of the audience, defendant says, was calculated to prejudice his case in the minds of the jury; but which demonstration was immediately suppressed and reprimanded by the court.

All honor to the court, but its suppressive force and just reprimand were too late to save the dignity and majesty of the law and the sacred right of the defendant to a fair and impartial trial.

The defendant here was not in fault, as the court intimates the Eanes were in their case. 10 Texas Crim. App., 453–454. This defendant was powerless, and did nothing during the trial or afterwards to arouse the whirlwind that swept over him and through the minds and hearts of jurors, caused by the maddened crowd, whose breath was hot with the thirst for defendant's blood. This occurrence, though ten times reduced in intensity, would imperatively demand a reversal of the case. The abuse of the privilege of counsel is evidenced by the effects it produced. Jenkins' case, 65 N. C., 563; Thompson's case, 43 Texas, 268; Hatch's case, 8 Texas Crim. App., 418; House's case, 9 Texas Crim. App., 567.

*R. L. Henry*, Assistant Attorney-General, for the State.

SIMKINS, JUDGE.—The appellant was convicted of the murder of Elias Mussett, and sentenced to imprisonment in the penitentiary for life, from which judgment he appeals to this court. The facts are few, but significant. Mussett, the marshal of Corpus Christi, was shot by appellant, who was one of his policemen. It seems that there was ill feeling between the parties, existing perhaps for years. On the night of the homicide the parties met near a dance, and the marshal taunted the appellant with being run out by some revellers the night before. He denied it, and stated that the marshal's informant was a liar. This was testified to by the witness Mitchell. Late in the night they again met and had loud words, as testified to by the defendant's witness Vela. At 1 o'clock that night deceased was on his way home, when he was stopped by Yndalacio Rosales, a saloon keeper, who talked a minute or two, when appellant rode up to them, and in half a minute a shot was heard, and Mussett fell from his horse, shot through the heart. Appellant claims that he shot to protect his life; that Mussett was just drawing to shoot him, when he drew and fired first. And a pistol was found near deceased's hand, but it was proven by the State that the codefendant Yndalacio Rosales placed the pistol there. The

appellant's statement makes it a case of self-defense, but it is contradicted by the other witnesses. He states that at the first meeting the marshal was insulting, and he simply asked him to investigate the matter. On the contrary, the witness Mitchell heard him denouncing Mussett's informant as a liar. At the second meeting he claims that the marshal did the threatening, and he was quiet; but Vela, defendant's witness, says there was loud talking by both parties. At the third meeting he says the deceased again renewed the charge, and he told him that his informant was a liar; that the deceased asserted "it was true;" that he replied "it was a lie;" that deceased replied, "You can't tell me that, you lying son-of-a-bitch," and drew his pistol, but before he could use it he shot him. Francisco Grande says Parker rode up and spoke. He does not know what was said, but in half a minute or so the pistol fired and killed deceased. Witness closed his shutters and went across the street, and was told by Yndalacio Rosales that appellant "killed deceased for nothing."

1. Appellant complains that the court erred in his charge on self-defense. The charge practically instructed the jury, that if they believed defendant's version of the difficulty, they should acquit him; and also charged them that the defendant would be justified in killing deceased if done to prevent deceased from wounding or maiming him; but, to justify the killing, it must reasonably appear from the words and acts of deceased that he intended to murder or maim defendant, and the killing must be done while deceased was in the act of committing such offense, or after some act done by him showing such evident intention. A similar charge by the same judge was sustained by this court in the Gonzalez case, 30 Texas Criminal Appeals, 225; and, though in some respects subject to the criticism of appellant's counsel, it practically states the law, and, there being no exception to it, we do not think, upon the whole case, appellant has received any injury. Cunningham's case, 17 Texas Crim. App., 99; Davis' case, 28 Texas Crim. App., 553; Penal Code, art. 570, subdivs. 1, 2. The jury evidently rejected the entire statement of appellant upon which alone any charge of self-defense could have been predicated, and appellant could not have been injured by reason of the imperfect charge.

2. The appellant complains that the court erred in overruling his motion to quash the special venire because of the failure of the return to show the diligence used in summoning the absent jurors. There were one hundred and twenty persons required to be summoned in the writ. The sheriff summoned ninety-three persons, and returned that eight persons named by him were found, by proper search and inquiry at their place of residence, not to be in the county, and that nineteen persons named in the return had not been summoned, as they resided or were in remote parts of the county, and after diligent effort could not be reached within the time allowed the sheriff for making

service and return. The writ was issued on the 9th of May, and made returnable on the 11th, the jurors to appear on the 13th of May. We think the return was sufficient. The time seems to have been very short, but the motion to quash did not present any objection on that ground, nor is it shown that the jurors summoned were not sufficient to enable the appellant to obtain a fair and impartial jury. Charles' case, 13 Texas Crim. App., 663.

3. The court did not err in permitting Cecilio Bustamente to testify in the case. The witness was twelve years old; on examination by the court, stated "it was wrong to tell a lie;" that if he told a lie he would be punished by law, but did not know what punishment would be inflicted; had never been to school; had been to the Catholic church. The court held the witness qualified. It has been repeatedly held by this court that the method of testing the competency of such a witness is confined to the discretion of the trial judge, and his determination of the question will not ordinarily be disturbed on appeal in the absence of any showing of abuse of the discretion. Taylor v. The State, 22 Texas Crim. App., 544. We see no abuse of discretion here. The testimony of the witness was connected and consistent, and corroborated. We see no other question requiring an examination, and the judgment is affirmed.

*Affirmed.*

HURT, Presiding Judge, concurs.
DAVIDSON, Judge, absent.

## ON MOTION FOR REHEARING.

HURT, PRESIDING JUDGE.—Appellant and Rosales were jointly indicted for this murder. Each moved, on proper affidavit, for a severance, asking that the other should be tried first. This motion was made under article 669a, Code of Criminal Procedure. Not agreeing upon the order in which they should be tried, the court directed that appellant be tried first. In this there was no error. The action of the court was in conformity to the statute (article 670). The court below is not presumed to know the facts of the case when passing upon this matter; not presumed to know that there was not sufficient evidence to convict Rosales, or that the evidence was stronger against appellant than Rosales.

In closing the argument for the State, counsel referred "in impassioned language to the pity that the jury owed to the deceased's family, instead of to the defendant, and urged the jury to bring in a verdict in support of the indictment; and after said argument, and before the charge of the court was given, the thronged audience applauded said argument, by the clapping of their hands and stamping of their feet, in the presence and hearing of the court and jury." The court, it

seems, of its own motion promptly suppressed the demonstrations, and reprimanded those applauding. Notwithstanding this prompt action of the court, counsel for appellant contend that this court should, because of such demonstrations on the part of the audience, reverse the judgment. There was no motion to change the venue of this case. There was no complaint that a fair trial could not be had in that county. If such a motion had been made, such conduct could have been looked to in passing upon the motion for new trial based upon the supposed error in overruling the motion for change of venue. But to make a rule that a judgment will be reversed because of such applauding in all cases, though promptly suppressed and reprimanded, would be very dangerous indeed. A person with death or imprisonment before him would not hesitate to have his friends ready and willing to applaud counsel for the State, with the risk of being sent to jail for contempt. This could all be arranged and executed, and the court could not ascertain the fraud by learning that the applause was instigated by the friends of the accused. We have very carefully examined the evidence in this case, and believe it establishes the guilt of appellant of murder of the first degree with reasonable certainty.

Now, we desire to state, (1) that this court can not pass upon the credibility of witnesses; (2) that if the testimony of the boy (Bustamente) is true, appellant shot deceased without cause. In fact, appellant's version of the facts attending the homicide is absolutely false, and we can not reverse this judgment because the evidence fails to support the verdict.

In amended motion for rehearing, we find ex parte affidavits to the effect that the verdict of the jury was returned after the term of the court had expired. The record contains no such matter. Can we consider these affidavits? We can not. If in fact the verdict was returned after the term of court had expired, it and the judgment rendered thereon are null and void; that is, no verdict, and consequently no judgment. Now, if the sentence of the court upon a judgment entered upon a verdict thus returned should be attempted to be enforced, the defendant would have his remedy by writ of habeas corpus. On the trial of the writ, however, the State would have the right to be heard on the issue as to whether the verdict in fact was returned after the term of court had expired.

The motion for rehearing is refused.

*Rehearing refused.*