### FRANK FURLOW, SR., v. THE STATE.

No. 1795. Decided June 14, 1899.

**1. Special Venire—Sheriff's Return.**

Article 651, Code of Criminal Procedure, requires the officer to state the diligence used to summon the jurors (not summoned) and the cause of the failure to summon them. Held, this does not require that the officer should specifically state that he went to the house of the juror or his office or place of business, or how much time he spent in searching for him. Ordinarily, a return is sufficient which states that he made search where the juror was likely to be found and failed to find him.

**2. Same.**

On a writ for a special venire for 140 men, where the sheriff actually summoned 128 and 117 of these were present, Held, this was a good showing as to diligence by the officer, and the fact that his return as to seven of the absentees stated that "they could not be found in the county after diligent search and inquiry," was not a sufficient ground for quashing the entire special venire. On proper motion the officer might have been required to make a more complete return as to these absent jurors.

**3. Same—Absent Jurors—Practice.**

The court is not authorized to have attachments issued for absent veniremen who have not previously been summoned.

**4. Same.**

It is not error to refuse an attachment for an absent venireman who was not a resident of the county, he having moved from the county before he was summoned.

**5. Murder—Defendant as Witness—Evidence as to His Animus.**

On a trial for murder, where it appeared that the shooting originated in an altercation with regard to opening a road across defendant's land, and defendant having testified as a witness in his own behalf, Held, it was competent on his cross-examination to prove, as original testimony, that he had stated prior to the difficulty that he would stop the laying out of the road through his land with a shotgun. The testimony was admissible as original testimony indicating defendant's animus in going to the place of the difficulty armed with his gun.

**6. Same—Improper Argument of Counsel.**

On a trial for murder, where counsel for defendant in his argument has endeavored to enlist sympathy for the .children of defendant, who are present in the courtroom, defendant can not be heard to complain that counsel for the State has offset this by an appeal in behalf of the orphan children of deceased.

**7. Same—Conduct of the Trial—Practice.**

On a trial for murder, while an attempt to influence the jury by placing the deceased's weeping children in front of and close to the jury during the closing argument for the State, is unwarranted and should not be permitted, still, where such sensational display has not been excepted to, it will not constitute reversible error.

**8. Same—Remarks of Judge—Bill of Exceptions.**

On a trial for murder, where it appeared that three days before defendant's case was taken up, the trial judge, in impaneling the regular jury for the week, indulged in a lengthy exhortation as to their duties, which remarks were heard by the jurors on the special venire summoned to try defendant, and which remarks, it was claimed, were improper under the circumstances and were especially calculated to influence the jurors who heard them against defendant; Held, the bill of exceptions is defective in not showing that the jurors in this case, when impaneled, were examined as to this matter to ascertain whether they had been so unduly influenced against defendant; and the bill should have been accompanied by the affidavits of the jurors so influenced by said remarks.

APPEAL from the District Court of Fort Bend. Tried below before Hon. Wells Thompson.

Appeal from a conviction of manslaughter; penalty, two years imprisonment in the penitentiary.

The indictment charged appellant with the murder of J. R. Seay, on the 23d day of September, 1898, by shooting him with a gun.

Alex Kegans, Dabney Walker, Robert McKnight, and J. R. Seay, the deceased, were appointed by the court a jury of view to lay out a public road through defendant's land. After they had been a short time at the place where they were going to commence the view, defendant, who had been notified, came with a shotgun out to where they were, and directing his remarks to Walker, cursed him and Kegans, saying they were prejudiced against him, and if they had been gentlemen they would not have accepted the appointment upon the jury of view. He stated his opinion as to how the road should be laid out, and said: "You are a prejudiced jury of view." Deceased said, "I am not prejudiced against you," and defendant replied, "Mr. Seay, I don't fault you and McKnight, in any way, but Kegans and Walker are enemies of mine and should not serve on this jury of view." Deceased then said, "All I have against you, Mr. Furlow, is that I hear

you have been talking about my son." Defendant said, "You are a G—d d—n liar." At this Seay came around the corner of the fence into the open space between him and defendant, and going towards defendant told him he would not take that off any son of a bitch, and that he would take his gun away from him and break it over his head. When they were about twenty-five feet apart, defendant shot, and deceased fell and expired in a few moments. Deceased was in his shirt sleeves and had no arms about him. He was, however, a powerful man, who, one of the State's witnesses said, "was strong enough to have taken old man Furlow, the defendant, across his lap and paddled him like a child." It was proved that defendant frequently carried his gun with him. It was proved by the witness Bertrand that in the month of August before the killing, defendant had said that "he would stop the laying out of the road through his land with a shotgun."

*M. J. Hickey*, for appellant, filed a most able brief and eloquent argument which the Reporter regrets he can not condense without impairing its force, and which he can not reproduce in full for want of space.

*Rob't A. John*, Assistant Attorney-General, for the State.

HENDERSON, Judge.—Appellant was convicted of manslaughter, and his punishment assessed at two years confinement in the penitentiary, and he prosecutes this appeal.

Appellant filed a motion to quash the special venire on the ground that seven of the special venire who were drawn to try the case were not served by the sheriff, and the sheriff's return did not show the character of diligence used to summon them. It is shown that a special venire of 140 men was drawn, and all were served, except some twelve. The return of the writ as to seven of the names stated simply that they "could not be found in the county after diligent search and inquiry." Appellant, as before stated, urges that the return should have stated the character of diligence; that the statement of the sheriff was merely a conclusion, and not the statement of any facts. The statute (article 651, Code of Criminal Procedure) requires the officer to state the diligence that has been used to summon the jurors, and the cause of the failure to summon them. We know of no case, however, that goes to the extent of holding that the officer should state that he went to the home of the juror, or to his office or place of business, or how many times he went to such place or places, or how much time he spent in searching for the absent juror. In Lewis v. State, 15 Texas Criminal Appeals, 647, a return similar to this, with the addition that the sheriff went to the residence of the juror, was held sufficient. And see also Parker v. State, 33 Texas Crim. Rep., 111; Charles v. State, 13 Texas Crim. App., 658. Ordinarily, we take it that the return stating that the officer used due diligence would

mean that he made search where the juror was likely to be found, and that further return, that he failed to find him would be a sufficient statement of the case. Powers v. State, 23 Texas Crim. App., 42; Rodriguez v. State, 23 Texas Crim. App., 503; Williams v. State, 29 Texas Crim. App., 89; Gay v. State, 40 Texas Crim. Rep., 242. But whether or not it is the duty of the officer to make a more complete return as to the details it is not necessary to decide in this case. We do hold that his failure to make a more complete return than was made herein was not a sufficient ground for quashing the entire special venire. On a proper motion, appellant might have required the sheriff to make a more complete return as to the diligence used for the absent jurors. It occurs to us that the sheriff made a good showing as to the diligence used in summoning the special venire. He actually summoned 128 out of a total of 140 drawn on the list, and of these 117 were actually present.

Appellant also complains because the court did not offer to have said seven absent jurors summoned or attached. The court was not authorized to have them attached, for they had not previously been summoned. Rodriguez v. State, supra. If appellant had any ground for believing that said jurors could have been procured, he might, on proper motion, have invoked the action of the court to have them summoned himself.

Appellant also objected to the refusal of the court to issue an attachment for the juror J. M. Damon. This juror appeared to be regularly drawn and summoned, but he failed to answer. When process was asked for the juror, the court was informed by the sheriff that said Damon was not a resident of the county, that he had moved away a short time before he had been summoned, and that he was afterwards summoned while in Richmond. The statement of the sheriff was not gainsaid, and it would have been a useless consumption of time to have sent out process for said juror.

The State, on cross-examination of appellant, who was a witness on his own behalf, asked him: "Did you not state in the courthouse in Richmond, Fort Bend County, Texas, during the month of August, 1898, in the presence of Walter Bertrand, that you would stop the laying out of the road through your land, with a shotgun?" Over the objections of appellant, the witness answered, "No." Appellant insists that this testimony was not admissible, because the same did not constitute a threat by defendant against the deceased, Seay, and because the defendant in his direct examination was not interrogated in respect to said matter. The court appears to have admitted said testimony for the purpose of laying a predicate to impeach defendant. The witness Bertrand was afterwards introduced, and testified that defendant did tell him on the occasion mentioned that he would stop the laying out of the road through his land, with a shotgun. In this connection we would observe that appellant complains in his motion for new trial of the failure of the court to limit this testimony to the

purpose of impeachment. Moreover, he complains of the use of it by
the district attorney as original testimony. Unquestionably, in our
opinion, the court was correct in the admission of said testimony,
though he assigned an incorrect reason for its admission. It was
original testimony. It was the declaration of defendant as to his
purpose of preventing the opening of a road across his land, and fore-
shadowed his animus in going to the place of the homicide on that
fatal day. It is urged in this connection that the difficulty did not
occur in regard to opening the road across the defendant's land. But
this was undoubtedly the occasion of defendant going down there, and
the altercation ensued about this very matter. He began to abuse
the parties for going there; said they were his enemies; and, when
deceased replied to this, he remarked that he did not include him, but
meant two others (naming them). Deceased then replied that, as
far as he was concerned, he had nothing against him, except he heard
that defendant had been talking about his son; and to this defendant
replied that he was a damned liar. Deceased replied that he would
not take it, and that he would take his gun away from him and
break it over his head, and, according to some of the witnesses, started
towards defendant, and he shot him. As stated before, the declaration
of defendant made to Bertrand was clearly admissible on the part of
the State as original testimony, indicating defendant's animus in
going down there armed with his gun. It was testimony supporting
the theory of the State. Of course, it was not conclusive; but appel-
lant could combat this, as he did, by showing that he went there for
a peaceful purpose, and carried his gun along simply out of habit, and
not for the purpose of interfering with the commissioners, or to raise
a difficulty with them. The State was authorized to use this as
original testimony, and there was no necessity on the part of the court
to limit it.

Appellant presents a bill of exceptions to a part of the closing
speech of the district attorney. We quote from the bill as follows:
"During the delivery of the closing address of the district attorney,
the four little children of the deceased man (J. R. Seay) were sitting
in front of the jury, at a distance of about five feet from the jury,
having been brought out of the audience and so placed at the com-
mencement of the district attorney's closing argument, by the de-
ceased's brother; and there they remained, frequently sobbing and
crying, during the entire closing address of the district attorney. The
bringing up and arrangement of the children in front of the jury
being done in the presence of the jury." The district attorney, in his
address, used this language: "Yes, gentlemen (so help me God), he
did; and by that shot, gentlemen (so help me God), he has left these
four little weeping children that you see sitting before you here. By
that shot defendant made these weeping children, you see in front of
you, helpless orphans, as their mother lies dead over there in the grave-
yard; and they are left without father or mother, helpless and without

protection.  Talk about sympathy, gentlemen!  My God! these little orphans cry out and appeal to you for justice.  They appeal to you to make the defendant pay the debt he owes the State for murdering their father; and these little weeping children, and all the good people, will applaud you when you make him pay the debt he owes the State."  The bill shows further that the attorneys for the defendant at the time, in open court, promptly excepted to the foregoing language of the district attorney, to which the court replied, "I will sign your bill of exceptions," but gave no admonition to the district attorney, nor in any way restrained him.  The court, in explaining this bill, says:  "The remarks of the district attorney were evidently made in answer to the argument of defendant's counsel J. C. Mitchell (the children and female relatives connected with the defendant were present in the court room), who appealed to the jury for sympathy for the children of defendant.  The district attorney said he was glad the defendant had appealed for sympathy for his children, as it gave him the right to say that the deceased's children, who were very young, were more entitled to sympathy than those of defendant, who were grown."  Now, as explained by the bill, the remarks of the district attorney were in response to similar remarks of the defendant's counsel in regard to the wife and children of defendant.  Both were perhaps improper, but the one was an offset to the other.  We understand that only the remarks were excepted to, and not the scenic performance of placing the children in front of and close to the jury during the closing argument of the State.  If this conduct had been excepted to, another question would be presented; for we can not but regard this as an unwarranted attempt to influence the jury by bringing the deceased's weeping children before them to inflame and excite their sympathy.  This character of sensational display should never be permitted in the courts of justice, neither for the State nor the defendant.  Of course, the relatives and friends of both deceased and defendant have a right to be in the courtroom and in the audience, but the court should carefully avoid the obtrusion of this character of influence on the jury.  No exception, however, having been reserved as to this matter, we do not feel authorized to reverse the case on that account.

It seems that the learned judge, in impaneling the regular jury for the week, which was some three days before the case against defendant was taken up for trial, in a lengthy address exhorted them as to their duties.  Among other things, he told them that the old saying that "it is better that ninety-nine guilty men should escape punishment than that one innocent man should suffer" was all wrong; that thousands of criminals had been turned loose on that sort of suggestion; that, in his opinion, it was better that an innocent man should be convicted, now and then, than that ninety-nine bloody murderers, burglars, and robbers should be turned loose upon the country.  He

also told the jury that the Horbach case was frequently used to be-fuddle juries; it was frequently used to fabricate the defense based on the hip-pocket movement; and he admonished the jury, when such a defense was raised to shield the guilty criminal, to scrutinize it closely. And furthermore he suggested to them that reasonable doubt was often invoked to frighten juries from their duty, and that shrewd lawyers frequently urged jurors, in the trial of cases, that, if there was any doubt, the defendant should be acquitted, but that such was not the rule; that our laws were intended for the protection of society; and that jurors should see to it that they were not influenced by any amount of sophistry. This, in substance, and much more, is presented in the bill of exceptions as the remarks of the judge to the jury for the week on their impanelment. The bill states that said charge, though delivered to the jury for the week, was heard by them and others who were on the special venire, several of whom were on defendant's case, and that one of the jurors who tried defendant's case was on the regular jury for the week, and was present on the regular panel, and heard the foregoing charge when the same was given by the judge. The bill, it occurs to us, is defective in not showing that the jurors, when they were impaneled, were examined as to this matter of the court's charge, to ascertain whether or not it in anywise unduly influenced them against appellant. Nor are we informed, by any affidavits, or otherwise, of the jurors who tried the case, that they were in anywise unduly influenced against defendant on account of said charge of the court. If appellant deemed that said charge proved injurious, as having affected the minds of the jury unduly against him, they should have been rigidly examined on their voir dire, or if, in the result of the trial, any juror who sat in the case was unduly influenced against defendant on account of anything said by the court in the charge referred to, the bill should have been accompanied by proper affidavits. Nothing of this character is presented, and we are not informed how said remarks, if it be conceded that they were entirely improper, should have influenced the jury against appellant. An able brief has been filed by appellant's counsel, and an eloquent criticism of the learned judge's charge delivered as above stated to the jury is presented; but it appears to us that appellant, in this respect, is much like Archimedes, who required a fulcrum on which to place his lever befor he should be enabled to overturn the world. We greatly admire the el. ·ence of counsel in this respect, but we apprehend his bill of excepti. ⁻oes not give it a proper support. Finding no reversible error in ⸱ ⸱ord, the judgment is affirmed.

*Affirmed.*

[NOTE.— pellant's motion for rehearing was overruled without a written opi. ion.—Reporter.]