UNITED STATES v. THOMAS et al.

No. C–3812.

District Court, E. D. Washington, S. D.

Nov. 17, 1943.

572

574

Edward M. Connelly, U. S. Atty., and Harvey Erickson, Asst. U. S. Atty., both of Spokane, Wash., for plaintiff.

Joseph C. Cheney, of Yakima, Wash., for defendants Thomas and Price.

M. C. Delle and Roy C. Stroud, both of Yakima, Wash., for defendant Lou D. Wilkins.

C. W. Halverson, of Yakima, Wash., for defendant Herm G. Link.

Harold F. Birnbaum, of New York City, Bonsted & Nichoson, of Yakima, Wash., and Roy E. Lowe, of Spokane, Wash., for C. I. T. Corporation.

SCHWELLENBACH, District Judge.

This is a conspiracy case in which the five defendants now seeking a new trial and six others were charged with having combined and conspired to commit acts and offenses against the United States by making, passing and entering false papers and documents for the purpose of influencing the action of the Federal Housing Administration in order to secure insurance under the modernization of homes provisions of the National Housing Act. Title 18 U.S.C.A. §§ 83–88; Title 12 U.S.C.A. § 1731. The five moving defendants are: C. I. T. Corporation, a corporation engaged in the financing of commercial paper; P. A. Thomas and J. Q. A. Price, who, under the corporation Thomas and Price, operate a fairly large furniture store at Yakima, Washington; Herm G. Link who, at the time involved in the indictment, was sales manager for Thomas and Price; Lou D. Wilkins who, at the time involved in the indictment, was manager of C. I. T.'s branch office at Yakima. The other six defendants, who were acquitted, were salesmen for Thomas and Price.

The Federal Housing Act as amended in 1938 included a home modernization program. Its purpose and objective was to provide employment. It was conceived that during the depression many persons of small financial means had permitted their homes to run down. These persons were not in a financial position to secure financing through regular sources. Private financial agencies were not willing to make one hundred per cent loans covering the costs of materials and labor, particularly when there was no mortgage device by which such loans could be protected since the real estate was, in most instances, already subject to mortgage. So the Congress set up the procedure by which the owners of homes could secure materials and labor for repairs and improvements and give therefor unsecured promissory notes. In order that private industry all along the line might benefit through the program, the participation of the Federal Housing Administration was limited to the insuring of these notes to the per cent felt necessary to protect the financial institutions involved against the risks which experience had proved were incurred in transactions of this kind. In order to encourage the origination of the transactions, dealers in home equipment and building material were permitted to handle them on a non-recourse basis. These dealers were charged with the responsibility of securing the signature upon the application which, while it contained a number of questions to be answered by the home owner, was in no sense complicated. That application was to be subject to check by the financial institution and the checking of the credit background of the applicant was at some stage of the procedure required. The notes signed by the applicants bore a low rate of interest and three years were allowed for the repayment. Financial institutions like the defendant C. I. T. were qualified by the Federal Housing Administration and a contract of insurance was entered into with them. The financial institution furnished the money required by the home-owner. Then, if the home-owner failed to pay, it was the obligation of the Federal Housing Administration to reimburse the financial institution. The primary purpose of the Congress in authorizing the procedure was to stimulate employment through the means of improving and modernizing the homes of individuals whose financial condition was such that, otherwise, that could not be accomplished.

In the beginning the system provided that the money would not be paid out by the financial institution until after the materials had been installed in the house. Under this system, the dealer who arranged the transaction was required to furnish a completion certificate making proof that all of the materials had been actually installed in the house before he could be reimbursed for the materials he had furnished or had secured from other dealers and for the money he had advanced for labor in the installation. This system might have been satisfactory had it worked out so that one dealer furnished all the ma-

terials and supplied the labor. It did not work out that way. The modernization of a house involved the furnishing of lumber, bricks, cement, nails, plumbing, furnaces and other supplies. Usually two or three different types of laborers were required on a job. Under the completion certificate system, the dealer who originated the transaction was required to carry the load until the improvement had been completed. This proved too cumbersome and too burdensome. As a result, there was substituted for it an arrangement by which the materials might be paid for as soon as they were all delivered to the premises of the home-owner. There was shifted to the home-owner the responsibility of installation and he was given the opportunity of borrowing a sum sufficient to pay for the labor of installation. Under this system, there was outlined in the application the details of the improvements to be made, the estimated costs of the materials and the names of the suppliers from which such materials were to be secured. The responsibility of seeing that the materials had been delivered to the premises was placed on the originating dealer. He was required to secure from the borrower a receipt entitled "Borrower's Receipt for Merchandise" which read as follows:

"Notice to Borrower—Do Not Sign This Certificate Until the Materials Have Been Satisfactorily Delivered.

"I hereby acknowledge receipt in satisfactory condition of the materials listed in my application for a loan pursuant to the provisions of Title I of the National Housing Act as amended. Said materials shall be used to improve the premises of which the address is given below.

"(Signature) —————————

——————————————————
(Address of Property Improved)

——————————————————
(Date)
"Form 7789 – 100M8–39"

He was then required to sign what is called a "Dealer/Contractor/Applicator" statement which reads as follows:

"——————————————
(Date)
"To: C.I.T. Corporation:

"In consideration of your purchasing the note given by the debtor(s) whose signature(s) appears on the Borrower's Receipt on the reverse hereof, we hereby certify that all articles and materials contracted for have been furnished, that the signature(s) on the Note and Receipt for Merchandise are genuine, that the Receipt for Merchandise was signed after the articles and materials contracted for had been delivered, and that we did not and will not perform any part of the work involved in the installation and/or application of said articles and materials.

"(Signature) ————————————
(Name)
————————————————
(Title)

"Dealer/Contractor/
"Applicator to whom the note is made payable must sign here

"| Do Not Use This Form If You Have Performed or Are to Perform Any Part of the Work of Installation and/or Application |"

The dealer then turned that, along with the borrower's promissory note, over to the financial institution and got sufficient money to reimburse him for the materials he furnished, to enable him to pay for the materials other dealers had furnished, and to give to the borrower an amount sufficient to pay the labor costs of installation. This simplified system relieved the dealer of all of his responsibility concerning the installation of the materials and enabled him and the other dealers involved to get their money within a short time after the delivery of the materials. It eliminated all risk upon the part of the dealer. All he needed to do was to certify that the materials contracted for had been delivered and he got his cash on non-recourse paper. There was, however, placed upon him the duty and obligation and responsibility in plain, simple, unambiguous terms to certify that all the materials contracted for had been furnished. The contract referred to was the signed application which was solicited by the dealers' salesmen and checked and handled by the dealers' employees.

Prior to August, 1939, Thomas and Price had handled their F.H.A. business through the Yakima Branch of the Seattle First National Bank. That business was done upon the completion-certificate basis. The Bank required of Thomas and Price a credit report from the Yakima Retail Credit Bureau as to the credit standing of each borrower. At that time, a man by the name of Pierson was manager of C.I.T.'s Yakima office. For some reason which was not explained in the testimony, Pierson was supplanted by the defendant Wil-

kins, who previously had been a collector for C.I.T. In July or August, 1939, Wilkins and Pierson went to Thomas and Price's office and met with defendant Herm Link and defendant Thomas. The purpose of this visit was to convince Thomas and Price that they should transfer their F.H.A. business from the Bank to C.I.T. Other meetings occurred between Wilkins and, other representatives of C.I.T. and Thomas and Price and Link. There is a sharp conflict in the testimony as to what was said at these meetings. The C.I.T. witnesses testified that they sold their system to Thomas and Price upon the basis of the actual F.H.A. procedure. They claim that they explained to Thomas and Price that the C.I.T. specialized in this sort of financing, that it had the facilities for credit investigation, and that Thomas and Price would be relieved of the expense of getting credit reports from the Bureau. The C.I.T. witnesses say that they explained to Thomas and Price the advantage of using the Dealer/Contractor/Applicator Certificate as compared with the Completion Certificate. The witnesses from Thomas and Price testified that Wilkins outlined to them the procedure which they actually later followed.

Whatever may have been said during these discussions, an arrangement was consummated by which C. I. T. took over this business. Wilkins assumed the task of instructing the Thomas and Price salesmen and the Thomas and Price office force. He met with the sales force practically every morning and he and other C. I. T. representatives addressed general meetings of all of the Thomas and Price employees at two or three monthly evening meetings. Wilkins and Link formed the practice of going out and having a second breakfast together each morning at which times the operation of the business was discussed. Thomas and Price increased their sales force from four or five to twenty-six. They scoured the Yakima Valley for possible borrowers and, during the fall of 1939 and the winter and spring of 1940, they handled many transactions. Practically the only item which Thomas and Price handled which fitted into the F.H.A. program was a floor furnace although, in a small percentage of the instances, other articles of merchandise were included in the plan. From the beginning of the campaign to the end, it was conducted for the purpose not of modernizing houses but for the purpose of selling floor furnaces. Re-

peatedly, prospective borrowers were told that they couldn't get F.H.A. loans unless they bought a floor furnace from Thomas and Price. During all of that time, Wilkins was instructor of the Thomas and Price salesmen. The typical plan of procedure was for a saleman to locate a customer who might be interested in the purchase of a Thomas and Price furnace. The customer was sold on the idea that he not only could get a furnace and have three years in which to pay for it, but that he would be furnished a large amount of cash with which he was incidentally to make other improvements in the house. The salesman took to the house a blank application form. No effort was made to have the form filled out in full prior to the time that it was signed. The salesman carried with him a sheet of scratch paper on which he took down many of the important items in the contract to be entered into between the borrower and Thomas and Price. He got the borrower to sign an application in which a large number of blanks were not filled. He also got him to sign a blank promissory note. This application was then taken back to the defendant Link who filled in the blanks in such manner as might seem necessary. It was then turned over to Wilkins who passed upon the credit element involved. Thomas and Price was then notified by Wilkins when the application was approved. The floor furnace was delivered in a truck by Thomas and Price. The truck driver was provided with the borrower's receipt for merchandise. This receipt was handed to the borrower or his wife who signed it despite the fact that none of the merchandise outside of the furnace had been delivered. It was taken back to the defendant Thomas or the defendant Price who signed the Certificate "that all articles and materials contracted for have been furnished" (without the slightest pretense of determining whether all the articles and materials contracted for had been furnished). The note and the receipt and the certificate were handed over to C.I.T., a check for the total amount of the purchase was then given to Thomas and Price who paid themselves for their floor furnace and who gave to the borrower a check for the total balance to be expended by the borrower for the purchase of supplies and the labor for installation when, as and if the borrower saw fit to carry out the provisions of his contract concerning the changes in which he was never informed in many instances.

Through this procedure, a large number of transactions were put through by Thomas and Price in the six months period.

The foregoing statement concerning the procedure covers most of the loans involved in the indictment. There are three, however, which are exceptions to the rule. The first is the borrower Graham. A short time before the transaction referred to in the indictment, Graham had secured through Thomas and Price and C.I.T. a loan under the circumstances above described. The bookkeeper in the office of Thomas and Price made a mistake and delivered to Mr. Graham a check in an amount one hundred dollars in excess of the amount to which he was entitled. When she called that mistake to the attention of the defendant Herm Link, his immediate reaction was to cause a new application to be made out so as to recoup their loss by another loan. Apparently it never occurred to him that, since a Thomas and Price employee had made the mistake, Thomas and Price should stand the one hundred dollar loss or that they should bestir themselves to attempt to collect the one hundred dollars from Mr. Graham. Link's explanation was that he called Wilkins upon this question and that they agreed that the method of procedure in making up the loss Thomas and Price suffered by the mistake of its employee was to make out an entirely fictitious application and put it through. Wilkins denies his participation in this portion of the transaction. Whatever happened between Wilkins and Link, the fact is established that Link got Graham to sign the false application. It was approved by Wilkins. The note and the certificate of the delivery of the articles and materials contracted for in the application was signed by Mr. Thomas despite the fact that no articles or materials were ever delivered under that contract. The money was paid by C. I. T. to Thomas and Price and the books of Thomas and Price were balanced by this contrivance.

The next exception was with a young man by the name of Messerschmidt who, for two and one-half months, had been operating a service station on leased property. He did not need any modernization program on his service station or the living quarters attached thereto. He did not even need a floor furnace or a heater. He had just purchased one from Thomas and Price a few months before. What he needed was supplies for his service sta-

tion—oil, gaskets and other things that service stations sell. He wanted $250 for those purposes. Thomas and Price was not interested in him unless he would buy a furnace or a stove of some kind so he was told that he should buy a stove for his mother. So he did that and, in addition, got $250. The defendants involved felt that something had to be done to meet the F.H.A. requirements so it was inserted in the application that the money was to be used for landscaping. Unfortunately, the service station property did not need landscaping but, in order to make everything regular, Mr. Messerschmidt filled in a hole in the back of the service station property at a nominal cost and spent most of the $250 for service station supplies.

The third exception was the borrower Tracy. He, also, was a W. P. A. worker. The salesman who dealt with him knew that because he had lived near him. The application described Mr. Tracy as a carpenter-contractor. His house did need improvement. According to the testimony of Tracy's wife, who was present at the time of the filling out of the application, Tracy's weakness was spending any spare cash that he had on gambling and liquor. She knew that this cash from Thomas and Price was to be expended upon home improvements so she went on two occasions to the office of Thomas and Price and informed the defendant Link and others there that when the transaction was completed, she wanted the check so as to make certain that the money was expended as contemplated. Her request in this regard was not complied with. The money was turned over to Tracy and it went the way that all funds were expended by him and none of it ever reached any of the improvements on the Tracy property.

To delineate in this opinion all of the errors and omissions and misstatements in the applications would extend it beyond any reasonable length. In each one, some of the information vitally important to the credit rating was erroneous. For example, in the Raybung application, Mr. Raybung's income was shown at $130 a month instead of $100 a month, which was the amount he told the saleman he received. His wife's income was shown as $90 per month throughout the year when, in fact, he told the salesman that she received $3.50 a day five or six weeks a year during the canning season. Mr. Weitschiek's statement showed his wife's income as $60 a month through the year when, actually, she only

worked five months out of the year. He had no fire insurance on his house but the statement showed he had $1,800 fire insurance. He told the salesman that he paid $1,038 for the house. The statement showed $1,200 and showed an assessed valuation of $2,500 which would have made its actual valuation $5,000. Messerschmidt had only been in his service station for 2½ months. This was known to Thomas and Price and C. I. T. because they installed the stove there when he first went in and put the transaction through Thomas and Price and C.I.T. He owed $228.34 on the first stove. Yet the statement showed no liabilities. His income was $20 a week. The statement showed $200 a month. Mrs. Paine had an income of $480 a year and the statement shows she had an income of $1,000 per year. She told the saleman she had no other income; but she also told the salesman she had a son, so the salesman wrote in that the son gave her $100 per month. She had no machinery or equipment, but the statement showed that she had $1,000 in machinery and equipment. She already owed the Federal Housing Administration $700 which she described in detail to the salesman. She also described that she owed $400 in back taxes. The statement shows no liabilities. That application was made on November 24, 1939. On the 12th of December, 1939, a new application for another loan was made. The first statement showed no accounts receivable but the second one, made 18 days later, showed $500 in accounts receivable. Her land and buildings, which were shown as of a value of $2,800 on November 24, were shown at $3,200 on December 12. By this time, her obligations to F.H.A. amounted to $1,330, since she had received the check on the first application, but, again, it was put through without any liability shown. Mr. Graham, the W. P. A. worker who obligingly signed the second application in order to enable Thomas and Price to recoup the one hundred dollar loss on his first transaction, was shown as a farmer with an income of $1,700 a year. Whatever income he had received during the previous year was from W. P. A. on the basis of $42 per month. Mr. McKissick had a small dairy ranch. In his application of September 7, 1939, his income, which actually was never more than three to four hundred dollars a month gross, was shown as $650 a month gross. He had no cash on hand and so told the salesman, but his financial state-

ment on the back of the application showed $500 cash on hand. He had some cows which he valued at $3,150. They were carried at $5,000 on the financial statement. He had a small amount of merchandise of doubtful value. It was put down as $1,000. On his second application of February 6, 1940, his income, which had been shown at $650 gross in September, was now shown as $750 per month net. He is shown as having one thousand dollars worth of life insurance when he had none. At the time of the making of the second application, he owed to the Yakima office of C.I.T. $1,300 and yet the statement showed that he only owed $1,125. He was actually in default on the first loan when the second one was made. The F.H.A. regulation prohibited such a transaction. Yet, no indication was made of the default and the application was approved by Wilkins and Thomas and Price. He owed $3,200 on his real estate contract. That had shown on the first application. Yet the second one showed he only owed $1,100. Among the assets shown in the second application was good will, trade marks, patents, copyrights, etc., $800. The borrower Crone had bought some furniture from Thomas and Price previous thereto. He owed $600 on it and the statement showed he owed $170.20. The testimony revealed that he had not been able to pay for this furniture and had gone in and done odd jobs for Thomas and Price so as to avoid having the furniture taken from him. His property was assessed at $725; the statement showed it assessed at $1,000. He had no merchandise, yet his merchandise was carried at $600 on his statement. Machinery, of which he had none, was carried at $800. He was shown as having $100 cash on hand, which was approximately $100 more than he had. Mr. Crone was a carpenter. He was designated in the application as a carpenter-contractor, with accounts receivable of $317.50, which was just $317.50 more than the accounts receivable owned by him. Mr. Tracy, the W. P. A. worker, who earned $480 a year, was shown as a carpenter-contractor at $1,000 a year. His house was worth $1,250, and it was shown on the statement as $2,500. As a carpenter-contractor, he was supposed to have machinery which was shown at $1,000, but he had no machinery. He was shown to have $60 in merchandise and $60 in cash, neither of which he had. These were just a few of the discrepancies and misstatements and errors presented by Link to

Wilkins and supposedly checked by Wilkins before the transactions were approved and the details went through.

In checking the credit rating of these individuals, Wilkins and the other employees of C. I. T. made a number of mistakes in their records independent of Wilkins' failure to catch the multitude of the mistakes in the applications and independent of Wilkins' failure to refuse to accept applications showing multiple handwritings and showing discrepancies as between the various applications received from the individuals which were so apparent and palpable that it is impossible for me to understand how anyone could have avoided discovering them. However, in passing upon this motion for a new trial, I am accepting the explanations of Mr. Wilkins and C. I. T. that those independent mistakes were independent and simply mistakes and I am not imputing any criminal intent to Wilkins or C. I. T. as a result of it. Consequently, I will not delineate them.

After the filing of the indictment, each of the defendants moved for a bill of particulars. That motion was confessed by the United States Attorney with a statement as follows: "I will assure counsel that all of the documents and papers upon which our case will be based will be filed with the office of the Clerk of the Court in ample time to enable them to investigate them and prepare their defense." The United States Attorney explained his reason for doing this rather than filing a bill of particulars as being that a large number of documents was to be involved, the question of multiple hand-writings was important and he thought that the rights of the defendants would be better protected by filing the originals than by having the copies of them made. Under the decisions, there can be no doubt that, had the United States Attorney filed a regular bill of particulars, he would have been allowed a considerable additional latitude in presenting proof of other transactions than those referred to in the indictment. Two days before the trial, counsel for defendants, in company with the United States Attorney, came to my office and complained bitterly that subpoenas were being issued which indicated that the plaintiff intended to make proof concerning other transactions than those referred to in the indictment. The defendants urged that they should be granted a continuance to have further time to prepare. The United States Attorney contended that there was no such limitation upon the Government. He asserted that if he had filed a bill of particulars, no such contention would have been made and that he did not see that this compliance with the demand for a bill of particulars being in the form that it was constituted any more strict limitation upon his rights than if he had had all the documents copied. Solely because of the statement made by him at the time of the confession of the motion, I determined to limit the Government's testimony to the twelve transactions referred to in the indictment. Plaintiff's counsel urged that I should rather grant the motion for continuance. However, I had set aside time for the trial of this case and determined to force the Government to trial under the strict limitations. As a consequence, the Government was limited to the proof of twelve transactions. I did not permit any testimony to be introduced by the plaintiff concerning any other transaction. I am familiar with no conspiracy case where such strict limitation was placed upon the testimony to be submitted by the prosecution.

The trial of the case resulted in a division among the defendants. The defendants C. I. T. and Wilkins presented their testimony and the testimony of their witnesses which was in sharp conflict with the testimony of the defendants Thomas, Price and Herm Link and their witnesses. The C. I. T. Corporation took the position that Wilkins had correctly explained the procedure to Thomas, Price and Link and to the Thomas and Price employees. Thomas and Price and Link, on the other hand, took the position that everything that they did was in precise conformity with instructions received from Wilkins and that all that they did was follow orders and directions. The jury evidently disbelieved at least a part of the testimony of each one of these groups of witnesses and returned a verdict of guilty against the five defendants. The six salesmen succeeded in keeping themselves in the background during the four weeks of the trial. They did not become involved in any of the sharp and bitter controversies between the other two groups and the jury returned verdicts of not guilty as to each of them.

The contention is now made, in support of the motion for new trial, that, since the six salesmen were acquitted, I

580

must now conclude that the statements made on the applications filled out as a result of the salesmen's efforts were all accurate and correct and that all the testimony of the many witnesses who testified as to the falsity of the statements must be disregarded. There are three reasons why this position is unfounded: (1) A large part of the misstatements are so apparent on their face that they cannot be disregarded. (2) The law does not require a jury to be consistent in its verdicts. United States v. American Socialist Society, 2 Cir., 266 F. 212; American Medical Association v. United States, 76 U.S.App.D.C. 70, 130 F.2d 233, 252. (3) The crime of which the defendant salesmen were acquitted was conspiracy and not the crime of violating the substantive provisions of the Act.

 By written brief and by extended argument counsel for C. I. T. urged the Court to grant a new trial on the ground that the verdict is against the weight of the evidence. In one of the most carefully prepared and the most forcefully presented arguments I have ever heard, counsel urges that I should set aside the verdict and grant a new trial. He has analyzed every point in the evidence and he has presented a multitude of pertinent cases. I recognize fully the proposition of law which he states. The cases upon which he relies fully support the position that I took in instructing the jury as follows: " * * * a conspiracy, under Federal law, is a corrupt agreement or combination between two or more persons to commit an offense or offenses against the United States" followed by an overt act. And further that a "common design and purpose is the essence of the crime of conspiracy", and, further, "The mere knowledge, acquiescence or approval of the act, without cooperation or agreement to cooperate, is not enough to constitute one a party to a conspiracy. There must be intentional participation in the transaction, with the view to furthering the common design and purpose." And, further, "Participation in the design or purpose of the unlawful enterprise is the essential thing * * *". And, further, "Before any man can be convicted of a crime, there must be established beyond a reasonable doubt that what he did was done purposefully with intent to violate the law. No person can be convicted of a crime because he made a mistake in good faith, or because he honestly relied upon

his best judgment or the advice of others upon whom under the circumstances he was entitled to rely." And further, "You must believe, before you can find any defendant guilty in this case, that the circumstances proved as to him exclude all possibility of his innocence, and that after considering all of the inferences reasonably to be drawn from the circumstances, that your sound judgment requires you to reject other inferences and accept only the inference of guilt." In addition to that, I am in full accord with the position that he takes as to the right and the duty of the Court to grant a new trial in the event that the Court feels that the verdict is against the evidence. I recognize that if I so felt, it would be my duty to set aside the verdict. It not only would be my duty, but it would be my inclination and desire. Unfortunately I am unable to agree with counsel's contention that the verdict of the jury was wrong. Had I been a member of the jury, I would have so voted myself.

The issue on this phase of the case divides itself into three parts: First, the false Borrower's Receipts and the false Dealer/Contractor/Applicator Certificate. On this point, counsel asks me to disregard entirely the testimony of all of the witnesses on behalf of the Thomas and Price corporation. I doubt whether I could do that even if I disagreed with the jury. My personal reaction is that, as the contest in the trial became heated, the witnesses on both sides embellished their testimony a bit and sharpened up their accusations against those with whom they disagreed. There is no dispute, however, over the fact that it was Wilkins who gave the instructions and who explained the procedures not only to Thomas and Price and Link but to all of the Thomas and Price salesmen and employees. I cannot accept the testimony of Thomas to the effect that Wilkins ran that branch of the Thomas and Price business and that he and his partner and all of their employees were mere pawns to be moved around by Wilkins. On the other hand, there was the closest relationship between the C. I. T. office and the Thomas and Price office—contacts many times each day. I cannot believe that all of the irregularities went on—false receipts, false certificates, false claims, complete disregard of the F.H.A. purposes and regulations—without Wilkins being fully aware of at least a good share of the irregularities. He was not the master of the transaction but he was the mentor of the other

defendants. No one could have had the close six months association with this transaction that Wilkins did and yet be as blindly ignorant as he claims to be. There is a good share of the testimony of the defendants Thomas, Price and Link that I could not accept. However, the physical facts make it impossible for me to disbelieve all of their testimony concerning Wilkins' connection with the transaction.

■ In a masterful manner, counsel for C. I. T. seeks to explain each and every of the irregularities in the applications. As he presented the argument, I marveled at his mastery of the detailed facts. The weakness of his argument, however, results from the factor that there is a point of diminishing returns on explanations. A man can explain one mistake or two or possibly a half dozen. There is a limit beyond which explanations are not acceptable. That limit was reached early in Mr. Wilkins' testimony in this case. It is true that in determining the question of good faith, the law does not require perfection. It does not require of one a suspicious mind towards those with whom he is dealing. However, one who, day after day and week after week, handles transactions replete with the red flags of danger such as were contained in the multiple handwritings and the innumerable mistakes in the statements in these applications, cannot rely upon explanations to satisfy the mind of any juror. The jury was instructed that they were not to convict upon mere mistakes but that they must find a corrupt motive and intent. The jury was perfectly justified in so finding.

As to the third branch of the case, i. e., the mistakes and irregularities in the credit reports, it is my opinion that they, standing alone, would not be sufficient for a conviction. If they were standing alone and were broken down into each separate item, a perfectly reasonable explanation could be made of each of them. I reviewed this group of mistakes simply as cumulative of the attitude of mind displayed in reference to the receipts, certificates and applications.

Counsel for defendants, Thomas, Price and Herm Link contends that the Court was so unfair to these defendants that it did not permit the jury to arrive at any other verdict than that of guilty. He contends that his clients were deprived of the opportunity of · presenting the defense of good faith insofar as the false receipts and the false certificates were concerned. Dur-

ing the trial, it was the opinion of the Court and every other counsel in the case except counsel for Thomas, Price and Herm Link that no person could misunderstand the language on the receipts and the certificate. Certainly no person of the business experience of either Thomas, Price or Link could have misunderstood it. This, particularly in view of the fact that they had had the background of the use of completion-certificates and they knew the change in procedure that was involved in the new receipt and the new certificate. The words "all articles and materials contracted for" meant just exactly what they said. The contract was the application. It did not involve merely the floor furnace purchased from Thomas and Price.

Not a small part of the difficulties involved in this phase of the case arose from the fact that these defendants had four different defenses upon this phase during the course of the trial. At the outset, with the first couple of witnesses, counsel took the position that the words "articles and materials" meant cash and that when the check had been delivered to the borrower that the certificate was true. During the remainder of the Government's case, the position taken by counsel for these defendants was that the words "contracted for" meant contracted for with Thomas and Price. The Government put in a statement signed by Thomas and Link to the Federal Housing Administration investigator in June, 1941, in the presence of their attorney and secretary of the corporation, Mr. Ellery Van Diest. (Mr. Van Diest is now an officer of the United States Navy. He was in the Navy during the time of the trial and was not available as a witness.)

"Yakima, Wash.
"March 12, 1941

"We the undersigned make the following statement to Carl V. Ramey, Special Agent, Investigation Section, Federal Housing Administration, knowing that same may be used in evidence.

"Mr. Lou Wilkins, Branch Manager, C. I.T. Office during 1939 and the early part of 1940, informed us at different times, as he had also informed the salesmen in sales meetings at Thomas & Price, that a good sales method to following in selling equipment to be financed with F.H.A. loans was to determine whether the house of the prospect needed some repairs and inform the prospect that if they cared to obtain some money to make the additional repairs to

582

their property this money could be obtained for them by negotiating a loan, if they would purchase a floor furnace, hot water heater or other eligible equipment from Thomas and Price. Mr. Wilkins further informed us that in this way our sales volume could be maintained.

"Further, he informed us that we should not attempt to investigate the credit of applicants, but that this should be left to the C.I.T. He also informed us to the effect that it was in accord with the policy of the F.H.A. to get a Completion Certificate signed prior to delivery of cash from the proceeds of these loans and that it was not incumbent upon Thomas & Price to determine whether the money from the loan was expended as prescribed in the Credit Statement although Thomas & Price was required to execute a Dealer/Contractor/Application Statement.

"Relying on information furnished by Mr. Wilkins as Agent of the C.I.T. we followed the policy outlined herein.

"The above statements in two pages are true and correct.
　　　　　"Signed: P. A. Thomas
　　　　　　　　　"Thomas & Price Co.
　　　　　　　　　"President
　　　　　　　　　"Herm G. Link
"Witness
　"C.V. Ramey
"Special Agent
Investigation Section
Federal Housing Administration"

It will be seen that in this statement all the blame was placed on Wilkins.

▉▉▉ Then, when Mr. Thomas took the stand, he testified that Price had balked at signing the first certificate and attempted to testify that from that point on they relied not only upon the assurance of Wilkins but also the advice of counsel. Upon objection being made concerning the testimony of advice of counsel, I excused the jury and permitted counsel to make an offer of proof which is as follows:

"Mr. Cheney: I offer to prove by this witness that he took up the forms of application, the completion certificate and the borrower's receipt, and all the forms, for two purposes. The first offer was to ask him as to whether or not, after reading over the applications and documents, whether there was any question about Mr. Wilkins' interpretation being correct, that the language of the receipt, the 'material contracted by'—whether that could be taken to mean merchandise delivered by

them or whether it was to be taken to mean all merchandise, whether it was described on the application or—"

"Mr. Cheney: Now, secondly, on account of—I know that comes in to the same thing at the same time. Mr. Thomas told Mr. Van Diest of the conversation that was reported by Mr. Price with reference to somebody having a rumor that they might not spend the money for the materials and improvements described and sought his advice the same as on the other matter, if there was any obligation under that situation for Thomas & Price with reference to seeing to the expenditure of the money loaned to the man himself, and that at that time—May I have the checks, the Messerschmidt checks? (Checks produced) And that at that time there was being endorsed upon the checks given to the man, that it merely stated "For Acceptance" or "This check is in acceptance of the FHA loan"—and whether or not there was anything that could be done by Thomas & Price to assure them or give more assurance that the money was actually to be spent by the borrower for the purpose of this. At that time Mr. Van Diest advised him, in order to get a little more assurance upon that part, to put in the endorsement of the check that it was to be used solely for the improvement of the real estate or the home, or something of that sort, and that they would get together and work out a form of endorsement that would be practically the same as the certificate of the borrower contained in the application and also as the certificate contained upon the borrower's receipt, to use the form of a stamp, and to place that stamp on the back of the check so that it would be called directly to the attention of the man at the time; that that would be a good thing to do; that it would probably gain more assurance, more of a moral suasion pressure upon the man getting it, that he would spend the money for the purposes of the loan, and that question wouldn't come up."

The endorsement referred to in the second offer of proof read as follows:

"Endorsement certificate that all articles & materials contracted for as per F.H.A. application C. I. T. account No. ——— have been furnished and delivered to me. Funds to be used for payment of same as required by improvement loan under Title one F.H.A.
　　　　　　　　　"Signed ——————"

This offer of proof was clearly objectionable on two grounds: (1) Because it did not state that Thomas had made a full disclosure to Van Diest of all of the facts involved. The offer of proof is devoid of any mention by Thomas of the background of the transaction, the facts concerning the prior use of completion certificates, the manner in which the transactions were handled, or to the F.H.A. regulations. In order to make use of advice of counsel, full disclosure must be made, Shushan v. United States, 5 Cir., 117 F.2d 110, 118, 133 A.L.R. 1040; Williamson v. United States, 207 U.S. 425, 28 S.Ct. 163, 173, 52 L.Ed. 278, in which the Supreme Court said that the trial court went as far as could be permitted when it said: "and fully and honestly lays all the facts before his counsel, and in good faith and honestly follows such advice, relying upon it and believing it to be correct". (2) The offers of proof themselves show that these defendants did not rely upon the advice of counsel. They point to the belief that Mr. Van Diest did not advise the defendants as the first offer would indicate. If Van Diest had advised the defendants as shown by the first offer, the second conversation referred to in the second offer would not have occurred nor would it have been considered necessary to have devised a false endorsement on the checks to be signed by the borrower. It is apparent from the second offer of proof that doubts existed in the minds of the defendants. This is demonstrated by the last portion of the second offer: "that that would be a good thing to do; that it would probably gain more assurance, more of a moral suasion pressure upon the man getting it, that he would spend the money for the purposes of the loan, *and that question wouldn't come up*" (Emphasis mine) If Thomas and Price originally believed that Van Diest advised them that they had no responsibility except to deliver the floor furnace, they would not have come to him and have sought his assistance in devising the endorsement technique. (3) The language of the certificate was so plain and apparent that it wasn't subject to interpretation by any lawyer. Nothing could be added to it by the interpretation by a lawyer. This question is not unlike that considered in Musser v. State, 136 Tex.Cr.R. 233, 124 S.W.2d 372, 375, where it was held that the defendant was not entitled to prove that he had been advised by an attorney that he was required to file a certain report. The Court said: "The

statute makes it plain that a distributor is required to file the report * * *. Under the circumstances, appellant could not defend on the ground that he acted under legal advice of an attorney." In another Texas case, Lewis v. State, 124 Tex.Cr.R. 582, 64 S.W.2d 972, 975, it was held that the advice of counsel was not admissible where, by a decision of a state supreme court, any ambiguity in the law was cleared up. The Court said: "We are aware of no decision of any court which holds that the violation of a statute may be defended on the ground of legal advice, the effect of which would be to overturn the law as construed by the courts of last resort." In People v. McCalla, 63 Cal.App. 783, 220 P. 436, 440 (writ of error dismissed, 267 U.S. 585, 45 S.Ct. 461, 69 L.Ed. 799), testimony was offered that defendant's lawyer had advised him that the security which he was selling was not a security within the statute. The section of the act under which defendant was prosecuted declared that every person who *knowingly* issued or sold or aided in the issue or sale of any security was guilty of the offense. Because the statute used the word "knowingly", it was claimed that, if there was no specific evil intent, the sale was not within the penal clause of the statute. Defendant argued, therefore, that good faith, based on advice received from counsel, should be considered as a factor in the determination of the defendant's guilt. The Appellate Court said: "There is no force in this contention. The term 'knowingly' means 'with knowledge,' and when used in a prohibitory statute is usually held to refer to a knowledge of the essential facts; and from such knowledge of the facts the law presumes a knowledge of the legal consequences arising from the performance of the prohibited act. * * * Here the penal clause under which McCalla was convicted does not make an unlawful or evil intent a specific element of the crime. The statute clearly forbids the acts denounced by it, and its language is plain and positive. * * * If the advice of counsel could afford immunity to one accused of the violation of a penal statute, it would result in the advice of an attorney being paramount to the law." In State v. Whiteaker, 118 Or. 656, 247 P. 1077, 1080, the defendant was permitted to introduce evidence as to the advice of counsel concerning the selling of certain securities without first obtaining a permit. He urged as error the failure of the court to instruct upon this phase of the case. The Supreme

584

Court of Oregon held that the evidence was clearly inadmissible saying: "It would be a strange doctrine which would permit the operation of statutes thus to be suspended. The alleged good faith of defendant was wholly immaterial. * * * Under the undisputed testimony there was no issue of fact involved. It was purely a legal question of whether the writing under consideration came within the term 'securities' as used in the statute. The trial court instructed the jury that it did, and in this conclusion we concur." In State v. Goodenow, 65 Me. 30, the defendants charged with adultery offered evidence that they had acted upon the advice of the justice of the peace. The Court said: "It is undoubtedly true, that the crime of adultery cannot be committed without a criminal intent. But the intent may be inferred from the criminality of the act itself. * * * the respondents say that they were misled by the advice of the magistrate, of whom they took counsel concerning their marital relations. But the gross ignorance of the magistrate cannot excuse them." In Hunter v. State, 158 Tenn. 63, 12 S.W.2d 361, 362, 61 A.L.R. 1148, the defendant attempted to rely upon the advice of counsel that the statute violated was unconstitutional. The Court said: "So that, conceding that proof of intent is required in prosecution for embezzlement under this statute, it appears that the intent required is an intent only to do the thing denounced in the statute; that is, appropriate to his own use the public funds and, if it should be conceded as contended that a fraudulent intention is requisite, and that such intent is subject to rebuttal, we cannot subscribe to the proposition that such rebuttal can be competently evidenced and established by testimony that the accused, who, with full knowledge of the law and a clear understanding of its provisions respecting his rights in and to the funds, deliberately violated it, acted in the belief, however honestly entertained, and however supported by the opinion of counsel, that it was unconstitutional." At 8 R.C.L. "Crim. Law" Sec. 95, we find the following: "The fact that a person honestly believes that he has a right to do what the law declares to be illegal will not affect the criminality of the act. The advice of counsel furnishes no excuse to a person violating the law, and cannot be relied upon as a defense in a criminal action." There is no similarity between this case and Hersh v. United States, 9 Cir., 68 F.2d 799. That was a bankruptcy case in which there were a multitude of very involved questions of law and fact confronting the defendant as to the manner in which he should conduct himself in the bankruptcy proceedings. He was charged with the concealment of property. All the court did in that case was to follow the recognized line of cases in bankruptcy prosecutions. It will be noted that the first case cited is United States v. Conner, 25 Fed.Cas. 595, No. 14,847, 3 McLean 573. In that case, the Court said: "A bankrupt is bound to exhibit a true schedule of all his property, and if he fail to do this, wilfully and fraudulently, he is guilty of perjury. But if he, being unacquainted with the requirements of the law, shall be advised by his counsel, after the facts have been fully stated to him, that certain items of property are not required to be stated on his schedule, and he omits them, he is not guilty of perjury." There can be no possible comparison between the complicated facts in the Hersh case and the other cases relied upon in that opinion and in the simple proposition involved here. The interpretation of the language "all articles and materials contracted for" is not within the domain of legal advice. All that was required for anyone to understand that language was an elementary course in grammer. Any grade school graduate would know what it meant. To have permitted the jury to have become confused by drawing across the trial the red herring of advice of counsel would have constituted a travesty on justice.

Later, when the defendants C.I.T. and Wilkins were putting in their defense in support of their denial that Wilkins had ever instructed Thomas and Price and Link as to the propriety of signing the false certificates, they introduced the testimony of witnesses as to a conversation allegedly occurring in April, 1940, in which they claimed they criticized Thomas and Price and Link for the practice of signing false certificates. They claimed that that was the first time at which Wilkins knew that the practice existed. In an effort to attempt to convince the jury that Wilkins had never approved of the practice, they submitted testimony that when confronted with the practice, Link and Thomas said that it was one approved by their attorney Van Diest. Without question, this testimony was admissible on behalf of the defendants C.I.T. and Wilkins. It went to an issue entirely foreign to the issue

of advice of counsel. That, however, did not cure the defects in the offer of proof of the defendants, Thomas, Price and Link. Consequently, I felt required to instruct the jury after the evidence was introduced and as a part of my general instructions that they must disregard this testimony insofar as it affected Thomas, Price and Link. It is to these instructions that these defendants most strenuously object. They frankly concede the rule that advice of counsel is not a complete defence but assert that it is an element of defence which the jury is entitled to consider in passing upon the question of good faith.

They did not propose any instruction on the issue of advice of counsel. They contented themselves with the general instructions on the question of good faith, all of which were covered in substance in the instructions given. Their objections go to the instructions given during the testimony of the witnesses for Wilkins and C.I.T. and the instruction given at the conclusion of the trial on this issue. The giving of such instructions was necessary and proper. I permitted the witnesses to testify as to their conversation with Link purely to enable them to attempt to negative the contention of Link and Thomas and Price that they relied upon Wilkins' advice. Having admitted the testimony for this purpose only, I was compelled to instruct the jury to disregard it for any other purpose. " * * * where evidence is introduced which is liable to be applied to a purpose different from the one for which it was introduced, the court should limit the application of the evidence to the purpose for which it is competent and for which it was admitted, * * *." 23 C.J.S., Criminal Law, § 1032, p. 409. The instruction concerning this limitation may be given either at the time the testimony is received or in the general instructions. Troutman v. United States, 10 Cir., 100 F.2d 628. Where the circumstances require it, it is error not to give such instructions both at the time of admission and in the general charge. Minner v. United States, 10 Cir., 57 F.2d 506.

Defendants Thomas, Price and Link also complain of the failure of the Court to give certain of the requested instructions. Most of them were given—not in the exact language requested, but in essence as requested. It must be remembered that, considering duplications, the defendants together requested 124 instructions. In those instances where different defendants proposed instructions covering the same subjects, the wording of each by any one defendant usually differed from the wording of proposed instructions on the same subject by each of the other defendants. It seems to me, in passing upon the details of instructions in this case, the Court must consider the language used by the Fifth Circuit in Burk v. United States, 134 F.2d 879, 883, as follows: "The practice adopted here of multitudinously requesting charges is so unreasonable and so unfair to the trial judge that to reverse him for refusing any of them would normally only be warranted upon a showing of error of the greatest and most grievous kind." For example, these defendants asked for an instruction as to each of them concerning testimony as to their standing and reputation. A number of the defendants offered such testimony. I did not feel that I could give a separate instruction naming each one. I did give one very complete instruction on this point covering all of the defendants who had offered such testimony and specifically told the jury that it was entitled to take such testimony into consideration "in determining whether there is a reasonable doubt such evidence must be taken into account." Each of the three defendants Thomas, Price and Link offered his proposed instructions numbers 2, 3, 4, 12, 15, and 16 on the question of good faith. I gave a complete instruction on the question of good faith in which I told the jury that in order to convict any defendant it must be established beyond a reasonable doubt that what he did was done purposefully with an intent to violate the law, that he could not be convicted because he made a mistake in good faith in which he honestly relied upon his best judgment or the advice of others upon whom, under the circumstances, he was entitled to rely and that the acts of a man are to be judged in the light of conditions as they appear to him at the time even though, in the light of later evidence, it may appear that what was done was erroneous or even criminal and that, when a defendant seeks to explain or justify an act on the basis of good faith and honest intent, it must be remembered that he is entitled to the benefit of any reasonable doubt. Clearly, that instruction covered everything to which these complaining defendants were entitled upon the question of good faith. I did refuse to give these defendants' proposed instructions

586

numbered 9, 10, 11, 12, and 13. In these proposed instructions, these defendants asked me to tell the jury that the Borrower's Receipts and the Dealer's Certificates did not mean what they said. I know of no rule of law which requires the Court to instruct the jury to disregard the facts. Had I given these instructions, I might as well have instructed the jury to disregard the false receipts and false certificates entirely. The language on the receipts and the certificates is plain and unambiguous. Thomas, Price and Link were not ignorant, uneducated, illiterate individuals. They were men of long experience in the business world. Each one of them for years had handled transactions in which mortgages and conditional sales contracts and similar papers were involved. To ask the Court to instruct the jury that they had a right deliberately to cause their truck drivers to get customers to sign a receipt for all the materials when they actually only received the floor furnace and to themselves sign certificates which were plainly false is to request a perversion of justice the mere requesting of which is not understandable to me. These defendants' request for instructions upon the question of circumstantial evidence were fully met in the instruction which was given. Some criticism was made in the argument for motion for new trial because of the absence of the word "hypothesis" in the instruction given. An analysis of the instruction given will disclose that it covered every element required of instructions upon that phase of the case. The exclusion of the word "hypothesis" was intentional and resulted from a number of experiences in making use of the ordinary instruction which uses that word and observing the difficulty that juries have in understanding the instruction when that particular language is read to them. As Judge Learned Hand said in United States v. Austin-Bagley Corporation, 2 Cir., 31 F.2d 229, 234: "We cannot agree that there are any inexorable formulas on the subject; * * * to translate such an admonition into a rigid ritual is to forget the actual determinants of a verdict and to mistake shadows for reality." The defendants Thomas, Price and Link also argue that they are entitled to a new trial because of the failure of the Court to give their proposed instruction No. 17 in which they asked the Court to tell the jury to take into account the question as to whether or not C. I. T. or F. H. A. have a right of

civil action against Thomas and Price for any losses they may have sustained as a result of the transaction. They also ask for a new trial because of the Court's failure to give instruction No. 18 which was filed just before the end of the final argument by the United States Attorney, a few minutes before the case was submitted to the jury. These two requests hardly need discussion by the Court.

 Defendants Thomas, Price and Link contend that they are entitled to a new trial because the Court refused to permit them to open up the case as to transactions other than those involved in the indictment and in sustaining the objections of all of the other defendants to their opening of the case. It will be remembered that, at the outset of the trial, these defendants joined with the other defendants in asking me to limit the Government in its proof to those transactions concerning which documents had been filed with the Clerk. I granted that motion. After hearing the opening statement of counsel for these defendants, I realized that he intended to attempt to open it to transactions outside of those to which the Government was limited to the extent that these defendants might get some benefit out of them. I warned counsel for these defendants and all counsel that the case must be tried upon one basis or the other. This warning was given immediately after the opening statements were completed. Counsel for these defendants made no objection at that time. He wanted to take full advantage on behalf of his clients of the rule limiting the Government and, at the same time, secure for his clients the advantage of testimony concerning other transactions when they might be used by his clients advantageously. I have never understood that cases were tried that way. Counsel for these particular defendants was most vehement in his protests as to the unfairness to his clients which would result unless the Government was limited to the twelve transactions. The limitation of testimony is a two-way street. If these defendants wanted to take advantage of the Court's ruling, they had to abide the results of the Court's ruling. But counsel for these defendants asserts that he changed his mind after two or three days of trial. He then decided he would have his cake and eat it too. That change of mind came too late. The motion which was made to restrict the testimony was a joint motion in which these

defendants joined with seven other defendants. Having agreed upon a course of action with their co-defendants, they were not permitted to desert their co-defendants and pursue a new course to which their co-defendants would not agree. Each time counsel for defendants Thomas, Price and Link attempted to open the case outside of the twelve transactions, I overruled the opposition of the Government but sustained the objection of the other defendants, all of whom were unanimous in the position that they entered into an agreement and understanding and that they intended to stand by it.

The trial of this case ended about 3 o'clock on a Saturday afternoon. The jury deliberated until dinner time. It was then taken out to dinner and returned about 8 o'clock in the evening and deliberated without interruption until 11:20. At that time, I sent word to the jury by the bailiff that I had no desire to hurry them but that if they felt tired and wanted to go to bed arrangements had been made for caring for them for the night. The jury sent back word that it felt it could agree upon a verdict that night and wanted to continue its deliberations. About 11:40, the jury sent in word that a juror or certain of the jurors wanted an instruction re-read. I notified the counsel who were present to bring in their clients and the Clerk notified the other counsel to appear immediately. It turned out that certain of the lawyers and certain of the defendants had scattered all over the City of Yakima. I had the jury brought out about ten minutes to twelve and we waited for the defendants and their lawyers to arrive. By twelve o'clock the defendants were not all present. Being uncertain as to the right to instruct upon Sunday and knowing from the manner in which the case had been tried by all of the counsel that I could take no chance of error in that regard, I told the jury that I was unable further to instruct them at that time and that they would have to wait until Monday for the re-reading of the instruction. No objection to this statement was made by any defendant or his counsel. Immediately thereafter, the bailiff by my direction, informed the jury that it was not necessary for it to continue its deliberations, that the jurors might immediately retire for the night. The bailiff returned with the word from the jury that it would appreciate the opportunity to have further deliberations that night and that it was the feeling of

the jury that it would be possible to arrive at a verdict if opportunity was given to it for further deliberation. Counsel for the various defendants were informed of that fact and were requested to have all the defendants present when the jury was ready to report if it desired to report. No objection was made by any defendant or his counsel to that procedure. After about forty minutes deliberation, the jury sent word that it had arrived at a verdict. By that time all of the defendants had arrived in court. The Court was convened and the defendants and their counsel were informed that the verdict was to be received. No suggestion or objection was made. The Court received the verdict, the jury was polled and it was discharged.

The defendants contend that they were prejudiced by this action in that I was mistaken in taking the view that the right to instruct upon Sunday was doubtful and that, in receiving the verdict, I committed two errors: (1) That I failed to give the further instructions requested and (2) that I coerced the jury into arriving at a verdict. In opposition to this branch of the motion, the United States Attorney filed affidavits which he described as having been signed by several of the jurors explaining exactly what occurred. Defendants objected to the consideration of these affidavits on the ground that since the rule is well established that a juror may not impeach his verdict it follows that he may not support his verdict. Counsel for the Government acceded to the position of defense counsel and withdrew the affidavits. I had not read them and have not the slightest idea what they contain.

In support of their position on this point, defendants have submitted a number of cases which fall into two categories: (1) That the Court has no right to refuse further instructions. (2) That the Court shall not coerce the jury into a verdict. There was no refusal by me further to instruct the jury. The right of a juror to waive his request for further instructions is recognized in an opinion written by Mr. Justice Rutledge when he was a member of the Court of Appeals for the District of Columbia, Jordon v. Bondy, 72 App. D.C. 360, 114 F.2d 599, 605, in which it was held that the only reasonable conclusion to draw from the circumstances was that the juror desiring additional instructions "resolved his doubts and no longer wished to have further instruction."

There was no coercion of this jury. The atmosphere was entirely different from that described in any of the cases upon which defendants rely. In Peterson v. United States, 9 Cir., 213 F. 920, the jury had reported to the Court that it couldn't agree upon the verdict. The Court sent them back and practically told them that they were compelled to agree. In Quong Duck v. United States, 9 Cir., 293 F. 563, 565, the trial judge told the jury that he didn't understand why a verdict had not been promptly rendered. In that case, the Court said that it found it impossible "to resist the conviction that the verdict not only may have been, but very likely was the result of the improper influence made by the remarks of the presiding judge". In Green v. Telfair, 11 How.Prac.,N.Y., 260, the Supreme Court said: "There should be nothing in his [the judge's] intercourse with the jury having the least appearance of duress or coercion. The jury, while all proper motives to induce them to agree upon a common result, may be repeatedly and earnestly urged upon them, should be left to feel that they act with entire freedom in their deliberations. That, should they continue to disagree, they are not to be exposed to unreasonable inconvenience, nor to receive the animadversion of the court." In that case, the Court told the jury that he had only discharged one jury in five years on account of their being unable to agree. In Meadows v. State, 182 Ala. 51, 62 So. 737, Ann.Cas.1915D, 663, the trial court indignantly sent the jury back with an injunction not to return with a report of disagreement.

All of the cases upon which defendants rely are cases in which the jury was threatened with serious inconvenience if it failed to agree. In the case of Wade v. State, 155 Miss. 648, 124 So. 803, 805, 85 A.L.R. 1406, the Supreme Court said: "Every judge knows the dread with which the average juror approaches the contemplation of being compelled to remain confined within the average courthouse during the long and unpleasant hours from Saturday night to Monday morning—a dread that is heightened, and in a large measure justified, by the crude accommodations towards comfort found in most of the courthouses in this country." In the case of Mathews v. Mathews, 227 Ill.App. 465, cited by counsel, this reference is made in the opinion: "After a long trial it is to be expected that some or all of the jury will be fatigued, mentally as well as physically, and if at the hour when they, and most men, are accustomed to sleep, they are forced to decide the case, it would not be strange if they failed to decide it correctly." In the only Supreme Court case cited, Hyde v. United States, 225 U.S. 347, 32 S. Ct. 793, 808, 56 L.Ed. 1114, Ann.Cas.1914A, 614, the jury had been out over the week end and reported at 11:30 on Monday morning that it was unable to agree. The Court sent them back and instructed them to make another effort to agree upon a verdict. At ten minutes before three in the afternoon, they again appeared in court and again declared that they were unable to agree. The Court instructed them further suggesting the possibility of the guilt of some of the defendants and not of others. The jury shortly after went out and returned a verdict of guilty as against two defendants and not guilty as to two others. The motion for new trial was based upon the ground that the verdict was the result of what "under the circumstances, amounted to coercion by the Court." The Supreme Court said this: "There is nothing in the record to justify the contention. It is true the trial was a long one and that the jury was not allowed to separate. Neither fact is unusual in criminal trials; the first is often necessary, the second often expedient, and contributes to an impartial judgment for and against defendants. It is true that the jury was in consultation for three days and nights without agreement, but the case was unusual in its issues and evidence and the detailed attention that was required." The Supreme Court affirmed the conviction and put aside the contention of coercion on the ground that in his instruction given at 11:30 A.M., the Court told the jury that the law would not recognize a coerced verdict or one which was not the free expression of the views and opinions of the jurymen. The Supreme Court concerning this said: "It is hard to believe that with that admonition yet in their ears they bartered their convictions, with that promise expressly made to them, they were coerced by a threat of confinement to acquit those who they were convinced were guilty, or convict those who they were convinced were innocent. But, even conceiving such possibility, we think the court rightly ruled."

■ There was no element of coercion involved in this instance. Nobody scolded the jury; nobody told them that they had

to agree. They knew that they were not to be kept confined in the jury room. Both at 11:15 and at 12 o'clock, the jury was told that it was free to go to bed. Each time the jury, on its own initiative, requested the Court to permit it to deliberate further. Counsel describes the horrible predicament in which the jury found itself of having to stay there over Sunday. The jury knew when it came to report on Saturday morning that it might have to stay over Sunday and arrangements were made by each juror to prepare himself with equipment and change of linen to meet such possible contingency. When counsel urge that the members of this jury bartered away the liberty of the convicted defendants in exchange for the jurors' personal convenience for one day, they are totally unfair and unjust to the jurors and show an utter lack of appreciation of the type of individuals to whom is entrusted decision in criminal cases in this court. This jury proceeded conscientiously and heard the testimony patiently and arrived at its verdict without coercion from the Court or anyone else. Assuming that the Court was overly cautious in not attempting to instruct the jury on Sunday, it was a caution justified by the meticulous care with which every counsel in the case raised objection to every possible point and reserved every possible exception. It is probable that had the instructions been given after twelve o'clock, the defendants would be here asking for a new trial on the ground that the giving of such instructions was improper. The issue is, was the juror or those jurors who wanted an instruction re-read coerced into waiving his or their right to such re-reading because of the action of the Court? I am positive that there was no such coercion and that no juror agreed to a verdict on the basis that defense counsel assert.

There are innumerable cases supporting this conclusion. In Brolaski v. United States, 9 Cir., 279 F. 1, 3, the jury deliberated for about seven hours the first day and at 11:40 the next morning they returned into the court room and reported that it was impossible to get an agreement after which the Court stated: "I do not desire to impose any hardship on you, gentlemen, but I was very much surprised to read in the papers yesterday morning that some sporting gentlemen with an apparent foreknowledge of the result were betting two to one on the result of the trial. There did not seem to me to be anything in the case warranting any such long odds. I do not desire to be a party to the easy winning or losing of bets of that kind. I think that the others who had confidence in the twelve men, if I may borrow a betting phrase, should at least have a run for their money. So I shall ask you to retire again." At ten o'clock the next morning, they returned a verdict. Objection was made to the remarks of the Court. The Appellate Court said: "We have given careful consideration to the remarks. We are unable to see in them anything of duress or coercion. It is not improper to send a jury back for further deliberation after they have announced in positive terms that they cannot agree. It is not improper to impress upon them their duty to reach an agreement. It is not improper to direct their attention to the serious nature of the crime charged." In Bernal v. United States, 5 Cir., 241 F. 339, 342, the jury was given the case at 2:30 p.m. Saturday. After several hours deliberation, they advised the Court they could not agree. They remained sequestered until Monday at 10:00 A. M. They then reported that they were unable to agree but the Court charged the jury it was their duty to agree and terminate the case. The Court said: "The defendant complains most loudly, however, because the jury was held from Saturday until Monday, and of the supplemental charge of the court. It is not unusual for juries to be held over Sunday in criminal cases; but, in any event, this was a matter resting in the sound discretion of the court, and no abuse of discretion is shown." In Dwyer v. United States, 2 Cir., 17 F.2d 696, 697, the jury went out at 11:45 A. M. At 10 P. M., the Court, on his own initiative, called the jury into the Court and stated:

"I am going to keep you together until you come to an agreement. That is the first thing. If you believe that you are likely to come to an agreement in the next half hour or so, I will remain here. If you do not think that you are likely to come to an agreement within that time, I shall leave here in five minutes, and you can deliberate as long as you please tonight, until 11 o'clock, and then I have made arrangements for you to travel together to a good hotel and to remain there together for the night. Then you can begin your deliberations again to-morrow morning, so that all I care to know at this moment is whether you believe it is worth my while, not leaving now, but remaining, in the

thought that you may come to an agreement within the next hour. * * *

"Juror No. 4: It does not point that we shall be able to get through to-night.

"The Court: You do not think it will be necessary for me to be on hand to-night?

"Juror No. 4: No."

The Court then proceeded to instruct the jury about being open-minded and of the necessity for the jurors listening to argument. It ended with a statement: "* * * it comes down to a question of whether it is all a cock and bull story, made up by somebody for some reason or other, or whether it is a fact that has been testified to, or facts." Within a half hour the jury returned with a verdict. The Appellate Court said: "If the whole episode be viewed as an entirety, we are unable to perceive that it had any tendency to coerce the jury or to treat any accused with unfairness. Coercion, as distinguished from duress, has often been called a moral wrong. There can be no wrong in reminding a body of jurors of their duty to exercise intelligence and listen to reason, and that was all that was done in the present instance. * * * Indeed, this whole point comes down to an objection to the use of the words 'cock and bull.' The phrase may be inelegant, it may sometimes be inappropriate, but for the purpose of bringing home to the jury the fact that there was no halfway between acceptance or rejection of the bald statements of facts that had been made by numerous witnesses who testified to their personal part in the illegal bringing in of liquor, we think the expression well chosen and quite timely." In United States v. Ryan, D.C., 23 F.Supp. 513, it was held proper for the Court to inform the jury that they would be discharged if they had not reached a verdict within two hours. In United States v. Thompson, D.C., 27 F.Supp. 905, it was held not to be coercion to suggest to the jury that they might bring in a sealed verdict. In the celebrated case of State v. Hauptmann, 115 N.J.L. 412, 180 A. 809, 828, certiorari denied 296 U.S. 649, 56 S.Ct. 310, 80 L.Ed. 461, the jury was advised that if a verdict was not rendered by a certain hour in the evening, the presiding judge would leave the court house and they would not be able to render a verdict until the following morning under any circumstances. The Court said: "It is suggested that this amounted to coercion; but we can see no coercion. Taking the statements in

the petition at face value, the incident is precisely similar to what occurred in Berry v. People, 1 N.Y.Cr.R. 43. In fact, the language used by the judge in that case was even stronger; and the Court of Appeals (1 N.Y.Cr.R. 57) held that it could not be construed as 'a threat of imprisonment or punishment.' 77 N.Y. 588." In Nowells v. State, 100 Tex.Cr.R. 476, 273 S.W. 561, 562, on Saturday the Court told the jury that the Court was tired and that he was going home to take a rest but he would receive a verdict when he returned Monday morning. The jury returned a verdict in about forty minutes thereafter and the appellant contended that this statement induced the jury to bring in a verdict of conviction. The Court said: "We are unable to agree to this contention, and see nothing in the bill that would indicate that the jury could infer from the statement of the court that he thought the defendant was guilty or that he thought he was not guilty, and, unless they could infer from the actions and statements of the court that the court thought him guilty, there could be no error in this particular. The record discloses that this occurred on Saturday. In Branch's P.C. § 269, it is stated 'remarks of the judge to the jury will not operate to reverse the judgment in the absence of showing of probable harm to the accused.' Furlow v. State, 41 Tex.Cr.R. 12, 51 S.W. 938, and many authorities there cited." In State v. Butler, 96 Or. 219, 186 P. 55, the Court refused to discharge the jury and told them to go back to the jury room and not to be stubborn. This was held not to be coercive. In Yancy v. State, 173 Ga. 685, 160 S.E. 867, the offer of the jury to disagree was met with the instruction by the Court that mistrials are serious matters. This was held not to be coercive. In Montgomery v. State, 19 Ok. Cr. 224, 199 P. 222, 223, the Appellate Court affirmed a conviction despite the fact that the trial court stated: "I expect that one man thinks there are eleven mighty contrary jurors. Gentlemen, it is important in these cases that you reason together and consider together and not get stubborn or arbitrary or unreasonable; reason among yourselves and see if you can not arrive at a verdict." In State v. Ball, Mo., 133 S.W.2d 414, the Court sent back the jury which had reported disagreement, telling them that the wife of the foreman was sick and it would like to excuse the foreman as soon as it could. This was held not to amount to coercion. In Cook v. State, 29 Ga.App.

270, 114 S.E. 925, the judge sent a message to the jury to hurry up and make a verdict if they could agree as the judge was going to adjourn court. This was held not to constitute coercion.

The defendant C. I. T. urges that I improperly submitted the case as to it because there is no evidence that what was done was done by any governing officer of the corporation or with the knowledge or consent of any governing officer of the corporation. On this point it relies upon the line of cases holding that a corporation cannot be liable for punitive damages when the tort was committed by an employee or agent other than a governing employee or agent. This for the reason that the corporation is not shown to have participated in the guilty intent of the employee and, therefore, cannot be punished for his illegal act even though such employee has acted within the scope of his employment. In support of this contention, it cites Lake Shore & Michigan Southern Railway Company v. Prentice, 147 U.S. 101, 13 S.Ct. 261, 263, 37 L.Ed. 97, in which the Court said: "Exemplary or punitive damages, being awarded, not by way of compensation to the sufferer, but by way of punishment of the offender, and as a warning to others, can only be awarded against one who has participated in the offense. A principal, therefore, though of course liable to make compensation for injuries done by his agent within the scope of his employment, cannot be held liable for exemplary or punitive damages, merely by reason of wanton, oppressive, or malicious intent on the part of the agent. This is clearly shown by the judgment of this court in the case of The Amiable Nancy, 3 Wheat. 546 [4 L.Ed. 456]." Other cases cited on this point are Ætna Life Insurance Co. v. Brewer, 56 App.D.C. 283, 12 F.2d 818, 46 A.L.R. 1499; Pacific Packing & Navigation Co. v. Fielding, 9 Cir., 136 F. 577; Bank of Palo Alto v. Pacific Postal Tel. Cable Co., C.C., 103 F. 841; and a number of other cases from other circuits. In addition to the cases cited on this point, there is a later Ninth Circuit case, Western Union Telegraph Co. v. Aldrich, 66 F.2d 26, 89 A.L.R. 352.

The plaintiff relies upon New York Central and Hudson River Railroad Co. v. United States, 212 U.S. 481, 29 S.Ct. 304, 307, 53 L.Ed. 613, in which rates in violation of the Elkins Act, 49 U.S.C.A. §§ 41–43, were fixed by employees not governing officers. C. I. T. denies the applicability of this decision on the ground that the act itself made the corporation criminally liable. Unquestionably, some limitation must be placed upon the reach of that decision because of the provisions of the statute. That limitation, however, should not be so narrow as to prevent the Court from reading, and considering the following language used in the discussion of corporate liability for crimes: "We see no valid objection in law, and every reason in public policy, why the corporation, which profits by the transaction, and can only act through its agents and officers, shall be held punishable by fine because of the knowledge and intent of its agents to whom it has intrusted authority to act in the subject-matter of making and fixing rates of transportation, and whose knowledge and purposes may well be attributed to the corporation for which the agents act. While the law should have regard to the rights of all, and to those of corporations no less than to those of individuals, it cannot shut its eyes to the fact that the great majority of business transactions in modern times are conducted through these bodies, and particularly that interstate commerce is almost entirely in their hands, and to give them immunity from all punishment because of the old and exploded doctrine that a corporation cannot commit a crime would virtually take away the only means of effectually controlling the subject-matter and correcting the abuses aimed at." The Supreme Court previously had declared in Washington Gas Light Company v. Landsen, 172 U.S. 534, 544, 19 S.Ct. 296, 43 L.Ed. 543, that a corporation is held responsible for acts not within its agent's corporate powers strictly construed but which the agent has assumed to perform for the corporation when employing the corporate powers actually authorized and in such cases there need be no written authority under seal or vote of the corporation in order to constitute the agency or to authorize the act. In Joplin Mercantile Co. v. United States, 8 Cir., 213 F. 926, 936, Ann.Cas.1916C, 470, it was held that a corporation could be convicted of conspiring to introduce liquor into the Indian country. In that case, the opinion does not show the position occupied by the employees of the defendant who participated in the conspiracy, but the Court did quote from Cook on Corporations, 6th Ed., Vol. 1, p. 94, as follows: "Even where it is necessary to prove a fraudulent and malicious intent it is held by the great

weight of modern authority that the fraud and malice of the authorized agents of a corporation may be imputed to the corporation itself." In United States v. Nearing, D.C., 252 F. 223, 231, it was held that a corporation could be convicted of conspiring to violate the Espionage Act 50 U.S.C.A. § 31 et seq. In passing upon the demurrer, Judge Learned Hand said: "It was, it is true, for long supposed that the criminal liability of corporations could not extend beyond the neglect of those positive duties imposed by law; but that depended upon the theory that acts of malfeasance being illegal must be ultra vires. * * * That the criminal liability of a corporation is to be determined by the kinship of the act to the powers of the officials, who commit it is true enough, but neither the doctrine of ultra vires, nor the difficulty of imputing intent or motive, should be regarded any longer to determine the result." This doctrine was affirmed when the case went to the Circuit Court of Appeals, United States v. American Socialist Soc., 260 F. 885, 887, affirmed 266 F. 212, despite the fact that Scott Nearing, who wrote the pamphlet involved was acquitted. In Zito v. United States, 7 Cir., 64 F.2d 772, 775, in passing upon the criminal responsibility of the corporation, the Court said this in response to the company's contention that it had no knowledge of a conspiracy and was not a party thereto: "In order to determine, therefore, whether or not appellant company was a member of the conspiracy in this case, it is necessary to consider the act or speech and conduct of the actors, etc. It is elementary that no formal agreement is required to make one a member of a conspiracy. The fact is, formal agreements are seldom, if ever, entered into by persons when engaged in an unlawful enterprise. Actions speak just as plainly, and sometimes more clearly, than words. Corporations speak and act through their agents. There is abundant proof in the instant case that one McNamara was an agent of the appellant company and that he had authority to sell its products. Therefore, it naturally follows that his actions in contacting and selling the individual appellants and the Capitol Products Company are binding upon appellant company." In United States v. General Motors Company, 7 Cir., 121 F.2d 376, 411, the conviction against the corporation was affirmed, despite the fact that all of the officers and agents of the corporation were acquitted, with this language: "The loss of the individual defendants was not fatal to the indictment as it charges that there were other persons to the grand jurors unknown who participated in the conspiracy. And at the trial it developed that the unnamed co-conspirators included a large number of officers and agents in addition to those named, who were also responsible for the acts and policies of the corporations convicted."

The case which most nearly parallels this one as to facts and which has influenced my decision here is Egan v. United States, 8 Cir., 137 F.2d 369, 379, certiorari denied, Nov. 15, 1943, 64 S.Ct. 195, 88 L.Ed. ——. There the charge was conspiracy to violate Section 12(h) of the Public Utility Holding Company Act, 15 U.S.C.A. § 79l (h), which prohibited campaign contributions by public utilities. Contributions were made by the corporations' officers and a research engineer, an operating auditor, a general auditor and officers of the subsidiary companies of the defendant. In that case, the instruction given was substantially the instruction given here. It was attacked upon the same ground as C.I.T. attacks the instruction which I gave. Concerning that contention, the Court said:

"The test of corporate responsibility for the acts of its officers and agents, whether such acts be criminal or tortious, is whether the agent or officer in doing the thing complained of was engaged in 'employing the corporate powers actually authorized' for the benefit of the corporation 'while acting within the scope of his employment in the business of the principal.' If the act was so done it will be imputed to the corporation whether covered by the agent or officer's instructions, whether contrary to his instructions, and whether lawful or unlawful. Such acts under such circumstances are not ultra vires even though unlawful. There is no longer any distinction in essence between the civil and criminal liability of corporations, based upon the element of intent or wrongful purpose. Malfeasance of their agents is not ultra vires. * * * The court is not concerned with whether political contributions were authorized by a resolution of the board of directors or acquiesced in by a majority of the board. Our inquiry concerns only the powers of the corporation, the business it was authorized to carry on in the exercise of those powers, and whether the officers of the company in making political contributions were engaged in carrying on that

*business within the scope of their official duties.*

\* \* \* \* \*

"The trial court correctly submitted the question of the defendant's corporate responsibility to the jury, and this court cannot set aside the jury's verdict."

 Here, as in the Egan case, there was no resolution by the board of directors authorizing Wilkins' participation in this conspiracy. However, C.I.T.'s contacts with this transaction were not limited to those made by Wilkins. Mr. Thrower, assistant vice-president of the company in charge of sales in the eight western states, was in Yakima during January, 1940, for one or two days. He was accompanied by a Mr. Ferguson who was his assistant. Referring to Thomas and Price, he testified: "I have been acquainted with their files and followed their activities for quite some time." He conferred with Mr. Thomas for an hour and a half or two hours discussing the Federal Housing activities of Thomas and Price. His purpose in going to Yakima was to impress upon Thomas the desirability of increasing the size of their individual transactions so that they "would give us a larger dollar income per transaction in order to make our business more profitable." He testified that Thomas told him that Thomas and Price had made arrangements with other dealers to supply building materials involved in the F.H.A. transactions. In other words, Thrower's conversation with Thomas was on one of the most important questions involved in this case; i.e., the method of handling materials other than those furnished by Thomas and Price. When we remember that it is C.I.T.'s position that Thomas and Price used the false certificate device because to have required the previous delivery of all materials would have been burdensome, it is inconceivable that Thomas and Thrower talked for an hour and a half without that issue having been discussed. The Thomas and Price files to which he referred and with which he said he was familiar contained some of the danger signals upon which the jury had a right to rely believing that there was a conspiracy here. They showed the multiple handwriting on the applications. They showed the discrepancies between applications in those instances where two transactions were had with the same individual. They showed the short periods which elapsed between approval of the application and the signing of the certificate. Counsel for C.I.T. argues that the time was not so short in many instances. However, that was a jury question. These transactions did not stop in the Yakima office. They went from Yakima to San Francisco and then to New York and from there the credit resumes went to F.H.A. It is true that the chance for detection of the method of handling decreased with each step in the procedure. However, the jury had a right to infer, from the fact that no criticism was made of Wilkins' method of handling, that it met the standard requirements of C.I.T. The testimony shows that the only criticism leveled at Wilkins by C.I.T. was that he was "too tough" in passing upon credits. Mr. Baker, the Western Washington manager for C.I.T., made frequent trips to Yakima during this period. He was Wilkins' immediate superior. He testified that he made it a practice each time he dropped into Yakima to examine all of the applications pending on Wilkins' desk. He attended a number of meetings and heard Wilkins instruct the Thomas and Price employees. He went with Wilkins to Thomas and Price's office and met Thomas and Link right after Wilkins took charge of the Yakima office. It was at that meeting that Thomas and Price were sold on the idea of transferring from the Bank to C.I.T. It was then that C.I.T.'s method of procedure was explained. Link's chief objective was to get fast service and Baker sold him on the idea that C.I.T. could give fast service. The jury had a right to believe, and it evidently did believe, that the illegal procedure used by Thomas and Price was the procedure prescribed for them by Wilkins. If that is correct, Baker was there when the procedure was described. In 1941, Baker told the F.H.A. investigator that the procedure used by Wilkins in Yakima was the customary procedure followed by C.I.T. My personal impression from viewing Wilkins in the court room and on the stand is that he did not conceive this plan. Wilkins' personal background is that some years prior he had served as an enlisted man in the regular Army. He had worked for C.I.T. for many years. Until September, 1939, the highest position he had reached was that of collector. Suddenly, he was put in charge of this office for the purpose of increasing the business. Wilkins impressed me as the type of man who obeyed orders. Wilkins' operations were subject to constant check. Mr. Kenville, the credit super-

visor working out of the San Francisco office, was in Yakima checking Wilkins in early December and early February. He impressed me as a very capable auditor. He testified that he got weekly reports from Yakima which included the applications, the notes, and the delivery certificates. The jury had a right to believe that, if Wilkins' method of operation was out of line with C.I.T. policy, Kenville would have caught it. In addition to that, Roy Nyholm, who worked under Thrower and was in charge of the Central Washington territory, attended one morning meeting and five or six evening meetings. He heard Wilkins giving instruction to the Thomas and Price employees. Wilkins' operations were not isolated. The jury apparently did not believe and I cannot believe that this whole illegal procedure was devised by Wilkins. I have no doubt that everything that was done was available to San Francisco and most of it was known by San Francisco. I cannot believe it to be the law that, because a corporation operates out of New York and must of necessity set up a western office giving to that office the authority and the responsibility to operate in eight states, that the corporation is not responsible for the activities of those to whom it entrusts that operation.

The motion for new trial of each defendant is denied.